# 24-1436-CV(L),
## 24-1567-cv(XAP)

In the
# United States Court of Appeals
## For the Second Circuit

ESTHER WILDER,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

SARAH HOILAND,

*Defendant-Appellee-Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE-CROSS-APPELLANT

GUY COHEN
DANIELLE C. ZOLOT
DAVIS + GILBERT LLP
*Attorneys for Defendant-Appellee-Cross-Appellant*
1675 Broadway
New York, New York 10019
(212) 468-4800
gcohen@dglaw.com
dzolot@dglaw.com

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................iv

PRELIMINARY STATEMENT ...........................................................1

COUNTER-STATEMENT OF THE ISSUES ......................................4

COUNTER-STATEMENT OF THE CASE .........................................5

   I.  Background ...........................................................................5

      A. The Parties ....................................................................5

      B. NICHE .........................................................................5

      C. Wilder Recruits Hoiland as a Principal Investigator ..................6

      D. The NSF Proposal ..........................................................7

      E. NICE .............................................................................8

      F. The Course Materials .......................................................8

      G. The Broader Goal: Spreading the Word About NICE .............10

      H. Hoiland's Responsibilities Included Presenting at Conferences .............13

      I.  Wilder Consented to Hoiland's Use of the Materials ...............13

      J.  Wilder Placed No Restrictions on Use of the Materials ..........14

      K. Hoiland Had Discretion to Use *NICE* Course Materials in Presentations About *NICE* .......................................................15

      L. The CCCLA Proposal ....................................................15

      M. The CCCLA Presentation and the Slides ...........................17

N. "Distribution" of the CCCLA Slides .......................................................19

O. "There Was a Much Larger Story That I Was Telling" ...........................19

P. The Bad-Faith Campaign ........................................................................20

Q. Wilder Registers the Copyright to File this Action ..................................23

II. Proceedings Below .....................................................................................23

SUMMARY OF ARGUMENT ...............................................................................25

ARGUMENT

I. Standard of Review.......................................................................................27

II. The District Court Correctly Concluded That Hoiland's Use
of the Unit 7H Text Was a Fair Use ..............................................................27

A. The Purpose and Character of the Use ......................................................29

    i.   An Important Purpose of the Use Was to Meet Grant-Related
       Dissemination Obligations ..............................................................29

    ii.  Hoiland's Use Was Transformative ................................................31

    iii. Hoiland's Use Was for a Nonprofit Educational Purpose .............41

B. The Nature of the Copyrighted Work.........................................................44

C. The Amount and Substantiality of the Portion of Use ............................44

D. The Effect of the Use Upon the Potential Market or Value....................46

III. This Court Should Affirm the Decision on the Separate
Ground That Hoiland Possessed an Implied License to Use
the Course Materials in Presentations about NICE .......................................48

A. This Issue May Properly be Considered on Appeal................................49

ii

B. Hoiland Possessed an Implied License to Use the Course Materials ......50

IV. The District Court Did Not Err in Holding that Wilder Failed to Establish Copyright Ownership.......................................................................................57

V. This Court Should Reverse the District Court's Erroneous Denial of Attorneys' Fees to Hoiland.......................................................................59

A. The Evidence Established That Hoiland Was Entitled to Attorneys' Fees .............................................................................................................60

i. Wilder's Copyright Claim Was Objectively Unreasonable ...........60

ii. Plaintiff's Improper Motivation Supports a Fee Award ................63

iii. Issuing an Award to Hoiland Serves the Goals of Compensation and Deterrence.....................................................................................65

B. The District Court Failed to Adequately Explain Its Denial of Hoiland's Motion for Attorney's Fees ....................................69

CONCLUSION ....................................................................................................71

CERTIFICATE OF COMPLIANCE.......................................................................72

## <u>TABLE OF AUTHORITIES</u>

**Page**

## <u>Cases:</u>

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
  11 F.4th 26 (2d Cir. 2021)..................................................................27

*Authors Guild v. Google, Inc.,*
  804 F.3d 202 (2d Cir. 2015)..........................................................40, 46

*Baker v. Urban Outfitters, Inc.,*
  431 F. Supp. 2d 351 (S.D.N.Y. 2006),
  aff'd, 249 F. App'x 845 (2d Cir. 2007)...............................61, 67, 70

*Baker v. Weber,*
  2021 U.S. Dist. LEXIS 188544 (S.D.N.Y. Sept. 30, 2021)..............50

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
  448 F.3d 605 (2d Cir. 2006)..........................................................32, 45

*Blue Moon Media Grp., Inc. v. Field,*
  2011 U.S. Dist. LEXIS 108066 (E.D.N.Y. Apr. 11, 2011) ..............68

*Bourne v. Walt Disney Co.,*
  8 F.3d 621 (2d Cir. 1995)..................................................................55

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) ..........................................................................28

*Cariou v. Prince,*
  714 F.3d 694 (2d Cir. 2013)..............................................................46

*Chivalry Film Prod's v. Ardito,*
  No. 05 Civ. 5627 (GEL), 2007 U.S. Dist. LEXIS 86889,
  (S.D.N.Y. Nov. 27, 2007), cert. denied, 128 S. Ct. 2064 (2008).....61

*Community for Creative Non-Violence v. Reid,*
  490 U.S. 730 (1989) ..........................................................................57

iv

*Disney Enters. v. Sarelli,*
16-civ-2340, 2018 U.S. Dist. LEXIS 168268, (S.D.N.Y. Sept. 26, 2018) .......59

*Drax v. Reno,*
338 F.3d 98 (2d Cir. 2003) ...............................................................................49

*Effects Assocs., Inc. v. Cohen,*
908 F.2d 555 (9th Cir. 1990)............................................................................51

*Falcon Enterprises, Inc. v. Publishers Service, Inc.,*
438 Fed. Appx. 579 (9th Cir. 2011) .................................................................51

*Fogerty,*
510 U.S. at 527 .................................................................................................66

*Fontana v. Harra,*
2013 U.S. Dist. LEXIS 35067, (C.D. Cal. Mar. 12, 2013) ..............................51

*Google LLC v. Oracle Am., Inc.,*
141 S. Ct. 1183 (2021) .....................................................................................27

*Graham v. James,*
144 F.3d 229 (2d. Cir. 1998)...........................................................50, 55, 56

*Grand Union Co. v. Cord Meyer Dev. Co.,*
761 F.2d 141 (2d Cir. 1985).............................................................................56

*Green v. Dep't of Educ. of N.Y.,*
16 F.4th 1070 (2d Cir. 2021)............................................................................39

*Hachette Book Grp., Inc. v. Internet Archive,*
115 F.4th 164 (2d Cir. 2024).................................................28, 29, 35, 44, 46

*Harbus v. Manhattan Inst. For Policy Research, Inc.,*
2020 U.S. Dist. LEXIS 74568 (S.D.N.Y. Apr. 27, 2020)..........................32, 41

*Harper & Row, Publrs. v. Nation Enters.,*
471 U.S. 539 (1985) ..........................................................................................28

*Hughes v. Benjamin,*
No. 17-cv-6493, 2020 U.S. Dist. LEXIS 139698,
(S.D.N.Y. Aug. 5, 2020) ........................................................63, 65, 68

*Huurman v. Foster,*
07 Civ. 9326 (MHD), 2010 U.S. Dist. LEXIS 61454,
(S.D.N.Y. June 21, 2010) ....................................................................59

*I.A.E., Inc. v. Shaver,*
74 F.3d 768 (7th Cir.1996)..................................................................51

*In Re Bolar Pharmaceutical Co. Securities Litig.,*
966 F.2d 731 (2d Cir. 1992).................................................................69

*Int'l Media Films, Inc. v. Lucas Entm't, Inc.,*
703 F. Supp. 2d 456 (S.D.N.Y. 2010).................................................57

*Int'l Ore & Fertilizer Corp. v. SGS Control Servs.,*
38 F.3d 1279 (2d Cir. 1994)................................................................49

*International Brotherhood of Teamsters, Joint Council 18 v.*
*New York State Teamsters Council Health and Hospital Fund,*
903 F.2d 919 (2d Cir. 1990)................................................................70

*Jacob Maxwell, Inc. v. Veeck,*
110 F.3d 749 (11th Cir. 1997).......................................................51, 56

*Jenkins v. City of N.Y.,*
478 F.3d 76 (2d Cir. 2007)..................................................................49

*Jennings v. Stephens,*
135 S. Ct. 793 (2015) ..........................................................................49

*Jorgensen v. Epic/Sony Records,*
351 F.3d 46 (2d Cir. 2003)..................................................................57

*Jose Luis Pelaez, Inc. v. McGraw-Hill Global Educ. Holdings LLC,*
399 F. Supp. 3d 120 (S.D.N.Y. 2019).................................................50

*Kerin v. U.S. Postal Serv.,*
   218 F.3d 185 (2d Cir. 2000)...........................................................27, 60

*Kirtsaeng v. John Wiley & Sons, Inc.,*
   579 U.S. 197 (2016)....................................................................60, 61, 66

*Knitwaves, Inc v. Lollytogs Ltd.,*
   71 F.3d 996 (2d Cir. 1995).........................................................................27

*Latour v. Columbia Univ.,*
   12 F. Supp. 3d 658 (S.D.N.Y. 2014)..........................................................51

*Leary v. Manstan,*
   No. 3:13-cv-00639 (JAM), 2018 U.S. Dist. LEXIS 49939,
   (D. Conn. Mar. 27, 2018)...........................................................................63

*Lulirama Ltd. v. Axcess Broad. Servs., Inc.,*
   128 F.3d 872 (5th Cir.1997).......................................................................51

*Mahan v. Roc Nation, LLC,*
   634 F. App'x 329 (2d Cir. 2016) ...............................................................67

*Mallery v. NBC Universal, Inc.,*
   No. 07 Civ. 2250 (DLC), 2008 U.S. Dist. LEXIS 20893,
   (S.D.N.Y. Mar. 18, 2008)...........................................................................61

*MidlevelU, Inc. v. ACI Info. Grp.,*
   989 F.3d 1205 (11th Cir. 2021)...................................................................50

*NXIVM Corp. v. Ross Inst.,*
   364 F.3d 471 (2d Cir. 2004)........................................................................28

*Orchano v. Advanced Recovery, Inc.,*
   107 F.3d at 99..............................................................................................70

*Quinto v. Legal Times of Washington, Inc.,*
   506 F. Supp. 554 (D.D.C. 1981) .................................................................48

*Sarl Louis Feraud Int'l v. Viewfinder, Inc.,*
   627 F. Supp. 2d 123 (S.D.N.Y. 2008)................................................... 31-32

*Screenlife Establishment v. Tower Video, Inc.,*
  868 F. Supp. 47 (S.D.N.Y. 1994) .......................................................................61

*TigerCandy Arts, Inc. v. Blairson Corp.,*
  09 Civ. 6215 (GBD) (FM), 2012 U.S. Dist. LEXIS 35269,
  (S.D.N.Y. Feb. 23, 2012) ...................................................................................68

*Vargas v. Transeau,*
  No. 04-CV-9772, 2008 U.S. Dist. LEXIS 59344,
  (S.D.N.Y. Aug. 6, 2008) ....................................................................................68

*Video-Cinema Films, Inc. v. Cable News Network, Inc.,*
  2003 WL 1701904, (S.D.N.Y. Mar. 31, 2003) ..................................................70

*Walsh v. Townsquare Media, Inc.,*
  565 F. Supp. 3d 400 (S.D.N.Y. 2021).....................................................65, 66, 67

*Weissmann v. Freeman,*
  868 F.2d at 1326...........................................................................................42, 47

*Zappa v. Rykodisc, Inc.,*
  819 F.Supp.2d 307 (S.D.N.Y. 2011).................................................................51

## Rules, Laws and Statutes:

17 U.S.C. § 107 ................................................... 27, 28, 29, 35, 41, 44, 46

Federal Rule of Civil Procedure 56 ........................................................27

Section 505 of the Copyright Act ......................................................4, 60

U.S. Const., Art. I, §8, cl. 8..................................................................66

## PRELIMINARY STATEMENT

This appeal hopefully represents the final chapter in a long, sad tale of academic paranoia and professional jealousy run amok. Dr. Esther Wilder provided educational instructional materials she developed for Dr. Sarah Hoiland's use in a collaborative, federally funded faculty-development program, and Hoiland used those materials as intended in a conference presentation. Nevertheless, Wilder somehow concluded incorrectly that Hoiland was "trying to take over" her project, and she then launched a multi-year smear campaign – replete with false allegations of "plagiarism" and "theft of intellectual property" – that was explicitly designed to challenge Hoiland's receipt of tenure, prevent her from being promoted, and otherwise destroy her career as an educator, researcher and social-justice advocate.

Wilder has failed at every turn. After a CUNY Research Integrity Officer rejected her allegations following an extensive inquiry, Wilder continued to torment Hoiland by filing the instant lawsuit, thereby converting a minor academic squabble over "credit" into a proverbial federal case. After years of wasteful litigation, the District Court granted summary judgment to Hoiland and dismissed Wilder's copyright infringement lawsuit. Demonstrating Javert-like persistence, however, Wilder filed and briefed the instant appeal nearly six years after the sparsely attended community-college "breakout" session that precipitated this saga.

1

Wilder, a Lehman College professor, recruited Hoiland, now an associate professor at Hostos Community College, to serve as a Principal Investigator and co-Director of a program called Numeracy Infusion for College Educators ("NICE"). Funded by National Science Foundation grants, NICE was an online course that used instructional materials Wilder developed under a prior grant to teach educators at community colleges and so-called Hispanic-Serving Institutions ("HSIs") in the Bronx to use quantitative-reasoning materials in their coursework.

But NICE's goals extended beyond CUNY. Wilder's funding proposal articulated the broader goal of making the program and course materials ("Course Materials" or "Materials") widely available through conference presentations. Indeed, the Hostos budget proposal earmarked funds for Hoiland to "present at professional conferences . . ., and participate in a variety of dissemination activities (e.g., community college and HSI conferences)." Accordingly, after receiving funding and running the NICE project at Hostos for two years, Hoiland did what the funding proposal required: She presented at a community-college conference and gave an overview of NICE to 12-20 attendees using Powerpoint slides containing excerpts of Course Materials as fleeting visual aids.

Wilder claimed that Hoiland's use of certain slides infringed her copyright in the Materials. This is nonsense. Wilder provided the Materials for use in the NICE project and wrote the proposal that required Hoiland to present at conferences to

2

make the Materials widely available. Wilder also imbued Hoiland with authority to independently run the Hostos program, and she placed no restrictions of any kind on use of the Materials. Under these circumstances, common sense dictates that Wilder provided implied consent for Hoiland to use the Materials in conference presentations about NICE. And common sense is buttressed by copyright law, which holds that an implied license exists when a licensor delivers a work with the intent that it be used for a certain purpose, and the licensee then uses it for that very purpose.

Hoiland's use of a small fraction of the Materials as a brief visual aid is also a classic fair use. Every day, professors, business people, TED speakers and others give lectures in which they *teach* about, and *comment* on, projects, writings and other copyrighted works, which often relate to important *research* and *scholarship*. Speakers routinely flash excerpts of the works on screens to keep conference attendees engaged. These are "paradigmatic" transformative uses, and Hoiland's use was especially fair because she was carrying out a stated purpose of the NICE project that Wilder knew about and that did not impede Wilder's ability to disseminate the Materials. Moreover, the use was for non-profit educational purposes that benefited the public interest; she did not get paid for making the presentation; and her primary goal was simply to teach community-college

3

professors about NICE so they could potentially improve the numeric skills of their financially disadvantaged students.

Both parties moved for summary judgment, with Hoiland's motion premised on the affirmative defenses of implied license and fair use. The District Court denied Wilder's motion and granted Hoiland's motion solely as to fair use. The District Court did not address the implied license defense. The District Court's well-reasoned decision and order should be affirmed, either on fair use grounds or, alternatively, because Hoiland possessed an implied license to use the Materials. After summary judgment was granted, Hoiland moved for an award of attorney's fees under Section 505 of the Copyright Act. The District Court denied Hoiland's application, and this Court should reverse that decision for reasons discussed below.

## COUNTER-STATEMENT OF THE ISSUES

1.     Whether the District Court properly granted summary judgment for Hoiland on the affirmative defense of fair use.

2.     Whether the District Court's grant of summary judgment should be affirmed on the alternate ground that Hoiland possessed an implied license to use the materials at issue.

3.     Whether the District Court correctly determined that there are disputed issues of fact regarding Wilder's claim of copyright ownership.

4.      Whether the District Court abused its discretion in denying Hoiland's motion for an award of attorney's fees as a prevailing party under the Copyright Act.

## COUNTER-STATEMENT OF THE CASE

### I.      Background

#### A.      The Parties

Hoiland is an Associate Professor of Sociology at Hostos Community College of the City University of New York ("CUNY"), a two-year community college in the Bronx.  Hostos serves an Hispanic student body and has been designated as an "Hispanic-Serving Institution," or "HSI."  (JA524)[1]. Wilder is a professor at, and employee of, Lehman College, a four-year CUNY institution.  (JA526, 530).

#### B.      NICHE

From 2011 to 2016, Wilder served as Principal Investigator ("PI') for a faculty development program called "Numeracy Infusion Course for Higher Education" ("NICHE"), which was funded by a National Science Foundation ("NSF") grant. (JA526).  The PI leads the program that receives NSF funding.  (JA525).  Numeracy, or quantitative literacy, concerns the ability to understand and use numbers and data in everyday life.  (*Id.*)

NICHE was primarily an online course designed to teach CUNY educators how to "infuse" numeracy or quantitative-reasoning ("QR") materials into their

---

[1] Cites to "JA" are to the parties' Joint Appendix; cites to "SPA" are to the Special Appendix.

5

coursework (JA527). The course consisted of eight units, each supported by assignments and other written materials. (*Id.*). Wilder claims to have written a substantial portion of the Course Materials, including Unit 7, a sub-section of which is at issue. The text of Unit 7H (the "Unit 7H Text" or the "Text") was first published as part of NICHE in 2013. (JA48.) To the extent Wilder wrote the Unit 7H Text, she did so within the scope of her Lehman employment; she did not apply for a copyright registration when it was first published or for years thereafter. (SPA17). Hoiland did not participate in NICHE and did not write the Materials. (JA526.)

One of NICHE's goals was to disseminate the Materials to institutions outside CUNY. (JA527). Thus, in the abstract for NICHE, Wilder wrote:

> The broader impacts of the project lie primarily in its demonstration of a model for engaging faculty throughout a large and diverse university system of campuses . . .

> The project is also providing tested QR learning materials and disseminating the NICHE course materials to other institutions who are similarly committed to improving the quantitative literacy and reasoning of their students. (JA527).

### C. **Wilder Recruits Hoiland as a Principal Investigator**

In May 2016, Wilder contacted Hoiland – who had experience researching numeracy in relation to minority students – about serving as the PI at Hostos on an extension of NICHE titled NICE, a project that had not yet received NSF funding. (JA526-528). NICHE was a CUNY-wide initiative targeting four-year colleges, and Wilder hoped to secure new funding by submitting a proposal targeting community

6

colleges and HSIs, including Hostos and Bronx Community College ("BCC"). (*Id.*). Accordingly, Wilder asked Hoiland to serve as a *co-equal leader* on NICE, which was to be headquartered at Hostos. Hoiland agreed. (JA528-30).

### D. The NSF Proposal

In May 2016, Hoiland and Wilder together submitted a grant proposal for NICE (the "NSF Proposal"). (JA528). The NSF Proposal was collaborative, meaning that two organizations intended to collaborate on the project. (*Id.*) Nevertheless, the NSF Proposal was actually two related proposals with different submitting organizations. (JA528-29). The first proposal identified Hostos as the organization to which the award should be made; Hostos as the primary place of performance; and Hoiland as the PI and Project Director. (JA529). The second proposal identified: "Research Foundation of CUNY on behalf of Lehman College" as the organization to which the award should be made; Hostos as the primary place of performance; and Wilder as the PI and Project Director. (*Id.*).

The NSF approved both proposals and funded NICE. As PIs on separate grants, Wilder and Hoiland were separately in charge of the programs for their respective institutions. (*Id.*) However, as co-Directors of the overall project, Wilder and Hoiland were jointly responsible for NICE's collaborative work. (*Id.*). And Hostos – not Lehman – was NICE's lead organization and "headquarters." (*Id.*).

### E. NICE

Like NICHE before it, NICE was designed to give participating faculty members ("Participants") an overview of the importance of QR materials in college courses; help Participants develop QR goals – *i.e.*, determine what they want their students to learn; help Participants develop lesson plans incorporating QR materials; provide best practices for teaching QR; help Participants develop tools to assess whether their numeracy-related efforts have worked; and have Participants incorporate the lesson plan and assessment into their classes. (JA530-31).

The NICE course was predominantly online. From 2017 to 2019, two "cohorts" of Participants took the course. Participants met in person for an orientation session with Wilder and Hoiland; attended a session in which a critical-thinking assessment test was administered; and, upon completing the course, attended a capstone conference. The remainder of the course was conducted online. (JA534-35).

### F. The Course Materials

NICE used the same eight units of Course Materials as its predecessor. The units were QR and Making Numbers Meaningful; QR Learning Outcomes; The Brain, Cognition, and QR; QR and Writing; Discovery Methods; Representation of Data; QR Assessment; and Math Anxiety and QR Stereotypes and Culture. Each unit was divided into 5-10 subunits. (JA536-38).

8

The first six units contained core materials for teaching educators to develop QR goals, QR lesson plans and best practices. (JA559-60). Unit One provided background on QR and its importance in college classrooms. (JA536). Unit Two provided background on creating QR learning goals. (JA536-37). Unit Three discussed how thinking processes are "fast," sometimes leading people to misinterpret numerical information. (JA537). Unit Four emphasized writing about numbers accurately across disciplines. (*Id.*). Unit Five discussed engaging students in ways that make numbers meaningful. (*Id.*). Unit Six contained materials designed to help *Participants* understand graphs, charts, and other visual representations of data and integrate them into their QR materials. (JA537-38).

Unit Seven and its subparts, including the Unit 7H Text, related to assessment – measuring whether QR-related materials and lessons had actually improved students' numeracy. (JA538). Although assessment is important, it is not the core of NICE, which, as noted, is covered in the first six units. (JA559-60). The Text contains instructions and guidance to assist Participants in creating assessment instruments, as part of their ongoing coursework.

Unit Eight focused on culture, gender, and race to better understand factors that fuel disparities in mathematics performance. (JA538).

9

### G.     The Broader Goal: Spreading the Word About NICE

One goal of NICE was to train educators at three HSIs who could then improve their students' QR skills and impart knowledge on other educators at Hostos, Lehman and BCC. (JA530-31). But NICE's goals extended beyond CUNY. Wilder had developed valuable training materials that could benefit educators countrywide. Therefore, the NSF Proposal stated that NICE's goals extended beyond participating CUNY institutions; the broader goal was to make the training program and Materials as broadly available as possible. (JA531).

This broader goal was articulated in the "Broader Impacts" section of the "Project Summary":

> NICE will also help faculty beyond CUNY. First, the project intervention and materials, including the NICE training program . . . will be made readily available on the NICE project website . . . To ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, the results will be presented at conferences, published in journals and disseminated through other relevant outlets.

(JA532, *see also* JA320).

This broader goal was reiterated in a section of the NSF Proposal titled "NICE at CUNY and Beyond":

> We will also support QR instruction through the dissemination of our research results. With an increased emphasis on QR and accreditors' strong focus on assessment, there is high demand for programs and resources that can be used to promote and assess students' QR skills. To ensure that our materials and evaluation results are widely available

10

to educators, policymakers, administrators, and researchers, we will present at conferences. . . .

(JA532; *see also* JA329).

This broader goal was also articulated in the budget justification section of the NSF Proposal on Hoiland's role. That section – titled "Budget Justification – PI Sarah Louise Hoiland" – states Hoiland's responsibilities and indicates that, among other duties, she will work with Wilder to direct the program; recruit Hostos faculty; ensure that the program "meets the needs of faculty at HSI community colleges"; coordinate in-person activities at Hostos; and direct research-related data gathering. (JA532-33, JA348.)

The budget justification also emphasized that Hoiland would present about NICE at conferences, including community college and HSI conferences. (*Id.*) Specifically, she would: "present at professional conferences [and] participate in a variety of dissemination activities (e.g., community college and HSI conferences)." (*Id.*) The proposed budget specifically contemplated Hoiland's traveling to various conferences. (*Id.*) The NSF Proposal provided: "The budget includes $7,000 for PI Hoiland to attend conferences both for professional development, dissemination activities, and networking with faculty from similar institutions." (*Id.*)

11

The purpose of conference attendance was to disseminate information about NICE and the Materials to educators outside of CUNY.  (JA533).

Upon completion, Wilder reported that NICE had met its goals regarding dissemination of the Materials and information about NICE.  In Wilder's Project Outcomes Report, she wrote:

> NICE has also helped faculty beyond CUNY as a result of our dissemination activities.  The instructional materials from the project are readily available on the NICE website (www.teachqr.org), which also includes resources on best practices and tools for engaging students in data analysis.  Moreover, our research on NICE—both existing publications/presentations and those in progress—contributes to our understanding of best practices for faculty development.  Finally, we have worked to ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers.  These efforts have included more than a dozen presentations, workshops, and scholarly papers.

(JA534).

Moreover, Wilder wrote in 2019: "I am fine with other people using the materials from the NICE/NICHE faculty development program – and indeed, I'm flattered when they do – because faculty development has always been important to me and I want to disseminate the materials as widely as possible."  (JA534).

12

### H. Hoiland's Responsibilities Included Presenting at Conferences

As PI at Hostos, Hoiland's duties, which she completed, included recruiting Participants; co-supervising and managing in-person aspects of NICE; reviewing documents submitted by Participants; addressing Participants' questions and helping them complete the course; collecting data; analyzing and reporting on data; and presenting at conferences. (JA538).

Consistent with their responsibilities, Wilder and Hoiland made presentations at conferences – sometimes together – about NICE. They shared excerpts of the Course Materials at conferences because the Materials were, in essence, the backbone of both NICHE and NICE. (JA538-39). As articulated in the NSF Proposal, the goal in these presentations was to "broadly disseminate" and make "readily available" the Materials and to inform educators about NICE and the Materials so they could potentially benefit from it. (JA539). Indeed, Hoiland believed conference presentations were important both because of her grant obligations *and* because NICE was an effective program that could positively impact faculty and students at HSIs and community colleges. (JA539-40).

### I. Wilder Consented to Hoiland's Use of the Materials

Wilder consented to Hoiland's use of the Materials, including the Unit 7H Text, in conference presentations. Wilder recruited Hoiland as PI at Hostos and co-Director of NICE, and she made the Materials available as *the* instructional

13

materials. (JA528, 530). Wilder was the primary author of the NSF Proposal, a goal of which was to make NICE and the Materials widely available. (JA529-32). To accomplish that goal, the NSF Proposal (once funded) explicitly required Hoiland to present at conferences about NICE and the Course Materials, which encompass the Unit 7H Text. (JA532-33; JA348.) Accordingly, Wilder implicitly consented to Hoiland's use of the Text.

### J.    Wilder Placed No Restrictions on Use of the Materials

Moreover, Wilder never placed no restrictions on Hoiland's use of the Materials in conference presentations. It's unclear whether Wilder owns the Materials or is otherwise authorized to restrict their use. Although Wilder claims to own NICHE and NICE materials, the only pre-dispute document she submitted – a copyright notice from a screenshot from an unidentified video – contradicts her position. That notice states that the "presentation is owned by CUNY NICHE." (SPA26).

But assuming that Wilder owns the Materials, including the Unit 7H Text, and is authorized to restrict their use, it is undisputed that she never did so. Wilder never required that she be identified as the Course Materials' author on presentations, or that specific citations or written attribution be given when the Materials are

referenced. Wilder placed no restrictions of any kind on use of the Materials. (JA553-54).

### K. Hoiland Had Discretion to Use *NICE* Course Materials in Presentations About *NICE*

Because no restrictions were placed, Hoiland, in her capacity as PI at Hostos and co-Director of NICE, had authority to decide how to use the Materials in without obtaining Wilder's approval. Although Hoiland was respectful of Wilder's seniority and status (JA551), Hoiland was her equal and didn't require Wilder's permission to use *NICE* Course Materials in NSF-mandated presentations about *NICE*. Wilder cites no contrary evidence.

### L. The CCCLA Proposal

In June 2018, Hoiland submitted a proposal (the "CCCLA Proposal") for a presentation she wished to make to the Community College Conference on Learning Assessment (the "CCCLA") at Valencia College. (JA540). The CCCLA was not a forum for formal presentation of research and scholarly papers; it was an opportunity for community-college educators to network and improve their pedagogical skills. (*Id.*). Because the CCCLA was a *community-college* conference concerning *learning assessment*, Hoiland determined that the CCCLA provided an excellent opportunity to comply with her obligation to present about NICE. (JA540-41).

In the CCCLA Proposal, Hoiland titled her planned session "Assessing Numeracy in a Faculty Development Program," identified the target audience as

"Teaching Faculty," and acknowledged her status as one of two PIs on NICE. (JA541). The CCCLA Proposal stated:

> This section will focus attention on strategies for assessing quantitative reasoning (QR) at community colleges. The presenter is one of two principal investigators of a National Science Foundation (NSF) faculty development program titled Numeracy Infusion for College Educators (NICE).

It further stated:

> In promoting the infusion of numeracy across the curriculum at CUNY, with specific attention to assessment, we will discuss both the challenges and successes we have encountered. Numeracy is tied to upward social mobility and we see our faculty development program as a way to infuse numeracy, using high impact practices and clear assessment tools, and help create more numerate students and citizens. (*Id.*).

The CCCLA Proposal listed three primary objectives: "To share best practices in faculty development related to assessment"; "To disseminate assessment results of our QR/QL faculty development program"; and "To discuss the challenges and successes related to assessment in the community college context." (*Id.*).

In July, Hoiland was informed that Valencia had accepted her proposal for the conference, which was scheduled for February 2019. Hoiland forwarded the acceptance email to Wilder and asked her to co-present. Wilder declined. (JA540-42).

**M.** **The CCCLA Presentation and the Slides**

In February 2019, Hoiland presented at the CCCLA during an informal "breakout" session attended by 12 to 20 community-college educators (the "CCCLA Presentation"). (JA542-43). The CCCLA Presentation was not a means of presenting an academic research article or paper. Nor was it recorded, transcribed, published or otherwise publicly disseminated. The presentation was a casual show-and-tell demonstration about a grant-funded program for the benefit of rank-and-file community-college educators. Valencia did not pay Hoiland or reimburse her for travel expenses. (JA542).

During the CCCLA Presentation, Hoiland used a PowerPoint with 23 slides as a visual aid (the "Slides" and each, a "Slide"), and the first four Slides introduced NICE. The Slides were not handed out; they were projected on a screen one by one. (JA543). The first Slide is titled "Assessing Numeracy in a Faculty Development Program," and below that it reads: "Sarah L. Hoiland, Ph. D. Assistant Professor of Sociology, City University of New York, Hostos Community College." The Slides identify only Hoiland because she was the sole presenter. The Slides do not identify Hoiland as the author of the Materials or the Text, and she has never claimed to have written these materials. Slides 2-4 describe NICE, summarize NICE's research

17

questions, and contain photos of Wilder, Hoiland and the faculty Participants. (JA543-44).

During this introductory section, Hoiland described NICE, stated that it was a NICHE offshoot, and discussed that NICE utilized the same Materials as NICHE. Hoiland explained that she had not worked on NICHE; she had joined a faculty-development course with supporting Materials already in place. (JA543-45).

Throughout the presentation, Hoiland spoke glowingly about Wilder. Hoiland pointed to Wilder in photos, identified her as a Lehman College professor, and described Wilder's instrumental role in developing NICHE NICE using the same Course Materials. (*Id.*) Hoiland discussed both of their roles as PIs on NICE. (*Id.*) Hoiland referenced Wilder so often and so admiringly that Hoiland is confident Wilder would have been embarrassed had she been there. (JA544).

The remaining Slides – Slides 5-23 – concerned other aspects of NICE. Five Slides – 9-13 – contain actual text from the Materials – specifically, the Unit 7H Text. (JA545-47). Hoiland moved quickly through Slides 9-13, which she included to show attendees what the Materials looked like and the types of questions Participants answered to prepare their assessment materials. (JA546-47). The other Slides included additional photos of Hoiland, Wilder and other Participants, as well as discussions of aspects of NICE and its results, along with materials created by a

18

Participant, Crystal Rodriguez, to "showcase a faculty participant's instructional materials" created during the program. (JA547-48).

From Hoiland's presentation, the attendees understood that Wilder was the driving force behind NICHE, NICE, and the Course Materials. Hoiland did not state or imply that she was the author of any Materials, including the Text. (JA543-45).

### N. "Distribution" of the CCCLA Slides

As required, Hoiland provided Valencia with slides in advance of the conference. After the conference, Hoiland was told that the Slides were available online briefly in connection with the CCCLA, but there is no non-hearsay evidence that the Slides were *actually* available on a conference website or otherwise distributed. (JA548).

There is no evidence that anyone – CCCLA attendees or otherwise – downloaded the Slides or viewed the Slides, except as they were shown briefly during the CCCLA Presentation.

### O. "There Was a Much Larger Story That I Was Telling"

The Slides were a "fleeting visual aid" and were not central to the presentation. As Hoiland explained, she was telling a "larger story," namely, providing a broad overview of NICE, which included, among other things, discussion of the process by which one can become a PI; the types of grants available; and how one can obtain basic information about NSF grants. Hoiland did

not go into assessment or other portions of the course in detail; she instead summarized best practices and provided a broad overview. For their part, the attendees did not show interest in the specifics of NICE; instead, they were focused on more general matters, such as whether faculty participants were paid, how she kept busy faculty participants motivated, and other generally applicable matters. (JA209-211).

### P.    The Bad-Faith Campaign

In August 2019, Hoiland willingly shared Slides with Wilder while discussing a different presentation proposal. From August 6-10, Wilder and Hoiland exchanged emails about the Slides (the "August Emails"). (JA549).

Despite having consented to use of the Course Materials, Wilder accused Hoiland of engaging in misconduct. Wilder expressed concern that Hoiland was somehow "trying to take over" her project; included a discussion of each of the 23 Slides, noting that many contain language from the NSF Proposal or the Materials; complained that Hoiland had supposedly presented at the CCCLA as the "sole author"; and alleged that certain Slides "were taken verbatim from what [she] had written," and that she "felt bad that [Hoiland] had not even acknowledged [her]." (JA549; *see also* JA389).

In the August Emails, Wilder expressed that Hoiland had not given her proper "credit" – that she believed Hoiland should have provided a citation on each Slide

that referenced text that she had authored. Wilder also claimed she should have been given "co-authorship" status on the Slides and on the CCCLA speaker program. Because, in her view, Hoiland had not given her proper "credit" or co-authorship status, the Slides constituted, in her estimation, "a form of plagiarism." (JA549; JA443).

Before this, Wilder and Hoiland had no communications about restrictions or limitations, or potential restrictions or limitations, on how Hoiland was permitted to use the Course Materials in presentations. (JA550-51; 553-54). Wilder and Hoiland had never reached agreements about restrictions or limitations on how Hoiland could use the Materials. (*Id.*).

Wilder had not previously told Hoiland that she could not use the Materials in presentations without identifying Wilder as co-author on the written materials. (JA553-54). Wilder had never told Hoiland that she could not use the Materials in unless she provided a specific citation or other written credit in the presentation materials each time Hoiland referenced a portion of the Materials that Wilder had authored. (*Id.*).

In addition, Hoiland never agreed to identify Wilder as a co-author or co-presenter of any presentations about NICE. (*Id.*). Furthermore, Hoiland never agreed to provide specific citations or written credit each time she referenced or a portion of the Materials in written materials for conference presentations. (*Id.*).

21

Nevertheless, Hoiland attempted to placate Wilder by contacting the CCCLA to update its records to identify Wilder as a co-presenter, and also by updating her CV to reflect the same. Despite these actions, Wilder commenced a vendetta against Hoiland and attempted to ruin her career. (JA555).

On March 12, 2020, Wilder sent a multipage email to John Tsapogas, a senior executive with CUNY's Research Foundation, accusing Hoiland of plagiarism. Her missive was shared with the Research Integrity Officers ("RIOs") at Lehman and Hostos. (JA562). Wilder stated – twice – that Hoiland should be denied tenure. She informed Tsapogas that Hoiland was scheduled to come up for promotion and that a decision would be made by April 21. Therefore, she told Tsapogas, actions against Hoiland needed to "happen immediately." Wilder then wrote: "I feel strongly that there is no way Sarah Hoiland merits promotion." (JA562, 235-38).

Wilder tried to make sure action was taken against Hoiland before April 21. On April 7, while the rest of the world grappled with COVID-19, Wilder submitted a complaint of research misconduct (the "CUNY Complaint") to lawyers for Hostos and Lehman. (JA562-63; 228-231). Wilder repeatedly accused Hoiland of "plagiarism," "research misconduct," and "theft." (*Id.*)

On June 23, Hostos' RIO informed Wilder that, in accordance with CUNY's polices, "an Inquiry will be conducted." (JA 241). The RIO stated that "[t]he purpose of an Inquiry is preliminary information gathering and preliminary fact-

finding to determine whether the allegations warrant a formal Investigation." (*Id.*).

Thereafter, both Wilder and Hoiland provided extensive information concerning

Wilder's plagiarism allegations, and each sat for lengthy interviews. (JA563). The

RIO ultimately rejected Wilder's allegations. (JA563-64).

In a note to Wilder, the RIO wrote:

In accordance with the *CUNY Research Misconduct Policy*, an Inquiry was conducted into the allegations of plagiarism that you brought against a Hostos faculty member in April of this year. After review, it has been determined that an Investigation is not warranted. Therefore, this matter will be closed, with all records of the proceedings treated as confidential pursuant to Section 5 of the policy to respect the rights and protect the reputations of all parties involved.

(JA563-64).

### Q.    Wilder Registers the Copyright to File this Action

In April 2021, after CUNY cleared Hoiland of wrongdoing, Wilder registered

a copyright in the Unit 7H Text in advance of filing the underlying lawsuit. (SPA17;

SPA21).

## II.    Proceedings Below

The parties both moved for summary judgment. On March 28, 2023, Wilder

moved for summary judgment as to copyright infringement, contending that she is

the owner of the Unit 7H Text and that Hoiland's affirmative defenses of implied

license and fair use lack merit. On April 18, 2024, Hoiland moved for summary

judgment on her affirmative defenses of implied license and fair use.

23

On February 1, 2024, the District Court, in a well-reasoned and thorough Opinion and Order (the "Opinion"), granted summary judgment for Hoiland on the affirmative defense of fair use. The District Court determined, among other things, that Hoiland's use of the Unit 7H Text was transformative; that it was educational, non-commercial and in the public interest; that the work was "nonfiction"; and that the use had "little or no effect on the limited market for the work." (SPA44). The District Court further noted that Hoiland "did not use the entirety of the work," and "edited the text in a way that was most relevant to her transformative purpose." (SPA44-45). Because it granted summary judgment as to fair use, the District Court did not consider whether Hoiland possessed an implied license to use the Text.

The District Court correspondingly denied Wilder's motion for summary judgment on fair use, and also held that Wilder had not established the absence of a genuine issue of material fact as to ownership because "the record [did] not permit the [District Court] to rule as a matter of law that Wilder is the owner of a valid copyright in the materials." (SPA27).

On March 1, 2024, Hoiland filed a motion seeking attorney's fees as a prevailing party under the Copyright Act. That same day, Wilder filed a motion to alter or amend the judgment.

On April 24, 2024, the District Court denied both motions. In denying Wilder's motion, the District Court held that Wilder had "not demonstrated clear

24

error or manifest injustice." (SPA53). In denying Hoiland's motion, the District Court stated summarily that the case did not present "the circumstances that courts within the Second Circuit have found to justify an award of attorneys' fees." (SPA55).

On May 23, 2024, Wilder filed a Notice of Appeal. On June 6, 2024, Hoiland filed a Notice of Cross-Appeal.

## SUMMARY OF ARGUMENT

<u>First</u>, this Court should affirm the well-reasoned Opinion of the District Court in holding that Hoiland's use of the Unit 7H Text was a fair use. As explained below, an analysis of the fair use factors weighs heavily in Hoiland's favor, such that her use of the Unit 7H Text constituted a fair use as a matter of law. As the District Court explained, Hoiland's use "was transformative; it was educational and non-commercial; the work is nonfictional; and the use had little or no effect on the limited market for the work." Indeed, Hoiland's entitlement to summary judgment on fair use as a matter of law is even stronger than the Opinion indicates, as one clear purpose of Hoiland's use was to comply with her dissemination obligations under the NSF grant for the NICE project.

<u>Second</u>, the Court should affirm the Opinion on the alternate ground in the record that Hoiland possessed an implied license from Wilder to use the Course Materials – including the Unit 7H Text – in the CCCLA Presentation. In fact,

25

Hoiland not only had permission to use the Materials, but she was actually *required* to give such presentations to comply with her obligations under the NSF grant for the NICE project.

Third, the Court should affirm the District Court's holding that Wilder failed to establish ownership of the copyright in the Unit 7H Text. As the plaintiff, it was Wilder's burden to establish ownership – an essential element of her copyright infringement claim. Instead, the record evidence, including evidence Wilder herself submitted, indicated that *CUNY* – not Wilder herself – owns the copyright in the Text. As the District Court correctly found, the record does not permit a finding "as a matter of law that Wilder is the owner of a valid copyright" in the Text.

Fourth, the Court should reverse the District Court's order denying an award of costs and attorneys' fees to Hoiland as a prevailing party under the Copyright Act. Wilder's conduct in relentlessly pursuing litigation arising from Hoiland's authorized presentation, which was a clear fair use, was wholly unreasonable. Indeed, Wilder has been driven by an improper purpose – professional jealousy and a malicious desire to damage Hoiland's career. In addition, awarding costs and attorney's fees will serve the twin aims of compensation and deterring other potential plaintiffs from clogging the courts with meritless claims. Alternatively, this Court should remand the matter for further proceedings because the District Court did not adequately its basis for denying attorney's fees.

## **ARGUMENT**

## I.     **Standard of Review**

This Court reviews summary judgment awards *de novo*, "applying the standards set forth in Federal Rule of Civil Procedure 56(c)." *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 36 (2d Cir. 2021). Although "fair use presents a mixed question of law and fact, it may be resolved on summary judgment where . . . the material facts are not in dispute." *Id.*; *see also Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1199-1200 (2021).

"The standard of review with respect to decisions to award or deny attorneys' fees . . . is abuse of discretion." *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 188 (2d Cir. 2000). This Court may reverse a district court's denial of attorney's fees where "the district court applied the wrong legal standard," or the denial was based on "a clearly erroneous assessment of the evidence." *Id.* at 188-89; *Knitwaves, Inc v. Lollytogs Ltd.*, 71 F.3d 996, 1012 (2d Cir. 1995).

## II.    **The District Court Correctly Concluded That Hoiland's Use of the Unit 7H Text Was a Fair Use**

The Copyright Act's fair use provision, 17 U.S.C. § 107, provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research, is not an infringement of copyright." *Id*. The statute provides four non-exclusive factors to consider:

(1)     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

27

(2)    the nature of the copyrighted work;

(3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)    the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* The four factors must be considered together, and none may be "treated in isolation." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). "Although defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in §107 weighs in their favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d Cir. 2004).

Moreover, "given the diverse array of copyrightable material, fair use is a 'flexible' concept whose application varies depending on the context." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 164, 179 (2d Cir. 2024). Indeed, the four factors are "not meant to be exclusive: Since fair use "is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts." *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 560 (1985).

Carefully considering the four factors, both individually and together, the District Court correctly determined that Hoiland's use was fair. The use was transformative; it was educational and non-commercial; the work is nonfictional; and the use had little or no effect on the limited market for the work. Accordingly,

28

and as the District Court correctly determined, no reasonable factfinder could fail to find in favor of Hoiland on her affirmative defense of fair use.

A.     **The Purpose and Character of the Use**

The first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).  When considering this factor, courts typically analyze "two sub-factors: (i) the extent to which the secondary use is transformative and (ii) whether the secondary use is commercial in nature." *Hachette Book Grp.*, 115 F.4th at 179. Here, however, an additional, preliminary sub-factor must be addressed: Hoiland's use of the Materials, including the Unit 7H Text, to meet her obligations relating to conference presentations that arose from the grant proposal that *Wilder* wrote.

i.     An Important Purpose of the Use Was to Meet Grant-Related Dissemination Obligations

One striking feature of Wilder's brief is its strained effort to analyze Hoiland's use of the Unit 7H Text in a vacuum – to strip it of context as if Hoiland had just stumbled upon Wilder's writing on the internet and blithely inserted it in her own work.  But, of course, context is critical.  As discussed, Hoiland was the PI at Hostos and co-Director of the NICE project, and the Materials, including the Text, were the project's sole instructional materials.  *Wilder* was the primary author of the NSF Proposal, an important goal of which was to make the NICE project and Materials widely available.  And the NSF Proposal, once funded, *explicitly required* Hoiland

29

to present at conferences – community-college conferences in particular – about the NICE project and the Course Materials.

With that context, it's clear that one "purpose" for Hoiland's use of the Materials, including the Text, was to comply with dissemination obligations under the NSF Proposal that triggered the NSF grant. As part of a mandated presentation about the NICE project at a community-college conference, it was, to say the least, "fair" for the PI and co-Director to show portions of the Materials that formed the backbone of the course.

Hoiland's use was especially fair because Wilder was aware of Hoiland's obligations, and she *consented to the use*. Wilder recruited Hoiland as an independent, co-equal leader, and Wilder made the Materials available as the NICE project's sole instructional materials. In addition, Wilder did not place restrictions of any kind on Hoiland's use of the Materials, including the Unit 7H Text. As a result, Wilder gave her consent and imbued her co-Director with authority and discretion to use the Text as she saw fit in presentations about the NICE project. Thus, Hoiland's use of the Unit 7H Text in a required presentation under the terms of the NSF grant weighs heavily in favor of fair use.

Fair use analysis typically arises only when a defendant has *not* obtained consent; if an express or implied license has been granted, there's no reason to address the fair use defense, which excuses what might otherwise be considered

30

infringing behavior. Here, however, the District Court did not decide the branch of Hoiland's summary judgment motion regarding the affirmative defense of implied license, and instead granted summary judgment solely as to fair use. Therefore, and because fair use is a "flexible concept," it is necessary and appropriate to address Wilder's knowledge of and consent to the use as part of the fair use analysis.

Hoiland contended on summary judgment, and contends on this appeal, that Wilder's claim is barred because she granted Hoiland an implied license to use the Text in conference presentations. But even if this Court were to conclude – as it should *not* – that questions of fact preclude summary judgment as to the existence of an implied license, Hoiland's good-faith use of the Text to comply with grant-related obligations, combined with Wilder's knowledge of those obligations, nevertheless tilts the scales of equity heavily, if not dispositively, in favor of fair use.

### ii.  Hoiland's Use Was Transformative

The next sub-factor "focuses primarily on the extent to which the secondary use is transformative; that is, whether the new work merely supplants the original, or instead adds something new, with a further purpose or different character, altering the original with new expression, meaning, or message." *Id.* at *22. A use is transformative where the use does not "usurp" the original, and where the purpose of the use is "plainly different from the original purpose for which the copyrighted work was created." *See Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 627 F. Supp. 2d

31

123, 128 (S.D.N.Y. 2008); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (first factor favored fair use where defendant's purpose is "plainly different" from original purpose).

This is true even where the secondary user has made an "exact replication" of the copyrighted work. *Sarl Louis*, 627 F. Supp. 2d at 128; *see also Harbus v. Manhattan Inst. For Policy Research, Inc.*, 2020 U.S. Dist. LEXIS 74568, at *9 (S.D.N.Y. Apr. 27, 2020) (defendant "displayed the Photograph along with the Article to educate the public about its work . . . . The fact that [defendant] displayed the Photograph in this new context and to serve a different purpose than Harbus' original purpose, weighs in favor of a finding of fair use.").

Here, the purpose and character of Hoiland's use of the Unit 7H Text was distinctly different from its original purpose. The Course Materials consisted of eight units, the first six of which comprised the heart of the course. Those units contained assignments and instructions to help faculty Participants understand the importance of QR in college classrooms; develop QR learning goals; and develop QR lesson plans; and improve their own understanding of graphs, charts, and other visual representations of data to integrate them into their coursework. Unit 7 concerned assessment – evaluating whether QR lesson plans accomplished their goals. And the Text's original purpose, as the District Court explained, "was to

provide instruction and guidance to the CUNY faculty participants on composing their own assessment instruments as an assignment for the course."

Hoiland's Slides containing the Text were not course assignments for conference attendees to complete; they served an entirely different purpose. The purpose of the CCCLA Presentation was to provide an overview of the *entire* NICE project – including the assessment unit – to an audience of community-college professors who were previously unfamiliar with it. By *teaching* attendees *about* this grant-funded faculty-development program, and *commenting* on challenges, successes, logistics and results, Hoiland's objectives were to broadly explain the importance of QR and how to implement and assess it in college coursework, and also to provide community-college professors with helpful information to potentially implement their own faculty-development programs.

Consistent with these objectives, the Slides, including those containing the Text, were merely fleeting visual aids for the overall presentation. As Hoiland aptly explained: "there was a much larger story that I was telling. The slides were not the focus of the presentation." This larger story was reflected in Hoiland's Valencia abstract, in which she broadly expressed her intent to "discuss how faculty develop QR learning goals, QR assignments, and QR assessments," "present preliminary assessment results," "discuss challenges and successes related to assessment in the community college context," and share "best practices in faculty development

33

related to assessment." This larger story is also reflected in the Slides themselves, which collectively summarize the whole NICE project and include (among other things) a "showcase" of a faculty participant's assessment instrument created as part of the course, "student reflections" on QR coursework, and a summary of a two-day workshop.

In addition, Hoiland's broader objectives were demonstrated by the content of her oral presentation and the response of the attendees. For example, knowing that CCCLA attendees would be interested in grants and other faculty-development programs, Hoiland showed the attendees both abstracts for NICE (for Lehman and Hostos), explained the type of grant they obtained (a collaborative proposal), and provided basic information about NSF grants. (JA544). For their part, the attendees during a lengthy question-and-answer session "were not interested in the particularities of the NICE program . . . [T]heir questions were more related to things like how did you recruit faculty? How much did you pay them? How did you get faculty to complete work when they're teaching four or five classes. . . . [W]hat are some best practices related to . . . working with a four year institution." Consistent with these objectives, Hoiland emphasized that she "did not plan to read the slides, stay on the slides, get into the nitty-gritty of the assessment unit but rather provide an overview of how the faculty development program approaches assessment." (JA209-11).

34

Under these circumstances, Hoiland's use was clearly transformative and not a "usurping" infringement of the Text. As the District Court determined: "Both the audience and the nature of Hoiland's use were different than Wilder's original use and purpose of the Text." (SPA32.) Not only was Hoiland's use transformative, but it is moreover a *paradigmatic* transformative and fair use. This Court has noted that "[p]aradigmatic examples of transformative uses are those listed in the preamble of Section 107: criticism, comment, news reporting, teaching, scholarship, and research." *Hachette Book Grp., Inc.*, 115 F.4th at 180.

It's difficult to imagine a *more* paradigmatic transformative use than Hoiland's use of the Text. As noted, the CCCLA Presentation involved "teaching," "comment," "scholarship" and "research." The teaching did not involve completing the underlying coursework, but instead involved teaching attendees *about* aspects of NICE. Hoiland provided extensive *commentary* on aspects of NICE, included commentary about results, challenges and ways attendees could learn from Hoiland's experience as a PI on an NSF-funded project. And Hoiland's fleeting use of the Unit 7H Text to show attendees what the Materials look like is the type of show-and-tell exhibit that speakers routinely and fairly use in conference presentations. Hoiland's transformative use weighs heavily in favor of a finding of fair use.

35

Wilder challenges the District Court's finding of transformative use in numerous ways. According to Wilder, their respective uses of the Text are "substantially the same" because both supposedly are lesson plans used to train college faculty members how to assess the effectiveness of their QR teaching. Therefore, Wilder grouses, there was no "justification" for using Wilder's work; Hoiland should have "composed her own QR learning assessment lesson plan"; and Hoiland instead "purloined" and "repackaged" Wilder's work to "save herself the time and effort." (Wilder Br. 29, 39, 41.) Wilder is wrong.

Wilder appears to contend that the uses are the same because one of Hoiland's stated purposes was to "share best practices in faculty development related to assessment." But sharing best practices is very different from providing instruction and guidance as part of a course. Yes, Hoiland fleetingly projected an excerpt of the Materials while sharing best practices as one piece of a sparsely attended lecture about NICE. As the District Court properly determined, however, such a use is transformative and distinctly different from using the Unit 7H Text to provide instruction and guidance to faculty participants on composing assessment instruments as an assignment for the underlying course. The conference attendees were not taking the course; hadn't completed assignments or created or implemented QR lesson plans; and couldn't and didn't create assessment instruments for (non-existent) QR lessons plans.

Accordingly, Wilder's extended riff about "packaging an infringing use with uses that did not infringe" (Wilder Br. at p. 44) is flawed. The premise of that argument is that Hoiland may have had proper purposes, such as disseminating results and discussing challenges and successes, but Hoiland can't escape responsibility for the allegedly improper purpose of sharing best practices by combining proper and improper purposes into a comprehensive overview. Such an approach, Wilder pontificates, "opens the door for endless mischief." (Wilder Br. 45.) As discussed above, however, this argument fails from the outset because sharing best practices is distinctly different from providing instruction and assignments to faculty participants as part of actual coursework.

And stepping back, Wilder's contention that Hoiland should have created her own training materials is bizarrely divorced from what actually happened. Again, Hoiland was a PI and co-Director of NICE. She didn't write the Materials and never claimed to. But the Materials, including the Unit 7H Text, were the instructional materials for NICE and she had discretion to determine how to use them. Of course she didn't create her own materials; these were the materials for the course on which she was required to lecture. So although her use was indeed transformative, it would have been well within her authority to use the Text as actual training materials for the course – as she actually *did* as part of her overall duties for the NICE project.

Wilder next claims that Hoiland's use was not transformative because it supposedly constituted 13% of the Slides; was the "heart" of the Slides; and was a "distinct sub-unit" of the Slides. But as the District Court noted, Hoiland's use of most of the text verbatim does not control the question of whether her use was transformative because, in a number of cases, "reproduction of an entire work has been found to be transformative." (SPA32.) Moreover, the portions Hoiland deleted, as well as the minor changes she made, were all in service to her transformative purpose. Thus, Hoiland deleted instructional material for the course participants (such as deadlines and instructions for peer review) because they would have been irrelevant to the conference attendees, who were not enrollees in the course and were not completing assignments. And Hoiland placed brief comments on several Slides as summary commentary, as would be standard and appropriate for an *overview* of the NICE project.[2]

Wilder also criticizes the portion of the Opinion that discusses Wilder's statement that she never would have consented to Hoiland's use of the Materials in the CCCLA Presentation because it was for "a different audience, context, and purpose than what she had originally intended." (Wilder Br. 52.) Wilder claims that

---

[2] Wilder complains that Hoiland increased the font size on certain Slides and contends that such enlargement cuts against a finding of fair use. But Hoiland explained what happened. Hoiland had originally placed all of the Unit 7H Text onto two slides with a small font in order to use them as a "quick visual." But the Valencia organizers asked her to break the text into additional slides for visibility, and Hoiland followed their instruction. (JA216-17).

this discussion was error and has no bearing on transformative use because "[a]uthors have every right to reject the use of their works if they do not approve of the context – no matter what the reason." But that misses the point. What is telling, as the District Court noted, was that Wilder herself highlighted and acknowledged the different character and purpose of Hoiland's use – its transformative purpose – in her statements about what she would not have consented to.

Finally, Wilder contends that the District Court erred by allegedly only addressing Hoiland's "display" of the Text during the breakout session, rather than separately addressing in isolation the "distribution" of the written document, which had been made available for downloading. As an initial matter, Wilder did not raise this issue on summary judgment before the District Court, and she should be precluded from doing so now. *See Green v. Dep't of Educ. of N.Y.*, 16 F.4th 1070, 1078 (2d Cir. 2021) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.").

Moreover, flexibly applying fair use principles in light of the relevant circumstances, the evidence shows that it was fair for Hoiland to provide the Slides to Valencia to make them available for attendees to download before the oral presentation. As a conference speaker, Hoiland was *required* to both provide written materials for her presentation and acknowledge that such materials would be made available for attendees to download. (JA548.) Hoiland complied with these

obligations and provided the Slides, which were not intended for broader public release; rather, they were solely assembled and designed as visual aids for the presentation. (*Id.*) In fact, the Slides would have been difficult, and perhaps impossible, to understand outside the context of Hoiland's oral presentation. Accordingly, it is unlikely that any conference attendee who did not attend the presentation either chose to download the Slides, or understood the Slides had they chosen to download and read them. In addition, more than just being unlikely, there is no evidence that the Slides were downloaded by attendees or viewed by attendees other than those who attended the presentation.

Therefore, making the Slides available in advance to conference attendees as an intermediate step and for the purpose of facilitating or enabling their use in the oral presentation was highly transformative and constituted fair use. *Cf. Authors Guild v. Google, Inc.*, 804 F.3d 202, 216 (2d Cir. 2015) (finding that making digital copies of books for the purpose of facilitating or enabling searches of the books involved a "highly transformative purpose" and constituted fair use).

Lastly, even if this Court were to consider the Slides in isolation and on the "flat written page," it would not change the conclusion that Hoiland's use of the Materials was fair. The oral presentation and Hoiland's description of how she used the Slides in their entirety provide valuable context that elucidates the purpose for her use of the Unit 7H Text. Without that context, the Slides are difficult to

40

understand, but the underlying transformative purpose is the same – to share the experience of the NICE program with community-college faculty.

### iii.   Hoiland's Use Was for a Nonprofit Educational Purpose

The purpose-and-character-of-the-use inquiry also addresses whether the "use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  As the District Court properly determined, Hoiland used the Text for non-commercial, educational purposes that served the public interest.

Hoiland presented at a continuing-education conference geared toward educating community-college faculty members about a faculty-development program designed, ultimately, to improve the quantitative literacy of their financially disadvantaged students.  Hoiland was not paid for the CCCLA Presentation, and its purpose – to disseminate information about the NICE project and Materials – was consistent with both the project's goals, as stated in the NSF Proposal, and Wilder's separately stated desire to widely disseminate the Materials.  In fact, as noted, one of the use's purposes was to meet Hoiland's obligations as a PI arising from the grant proposal that Wilder principally wrote.

Accordingly, and as the District Court found, Hoiland's use of the Text for an educational purpose further weighs in favor of fair use.  *See Harbus*, 2020 U.S. Dist. LEXIS 74568, at *9-10 (fair use determination is "bolstered by the fact that [the

41

defendant's] use of the Photograph furthers its research, scholarship and educational efforts").

Relying on *Weissmann v. Freeman,* (Wilder Br. 59-60), Wilder contends that Hoiland's non-commercial educational purpose does not outweigh the allegedly non-transformative nature of the copying and the fact that she allegedly used the Text to "advance her career." In *Weissmann*, two scientists jointly authored prestigious articles reviewing certain imaging techniques, prepared to accompany lectures and used by medical residents to study for specialty boards. After their collaboration ended, Weissmann wrote a revised article and Freeman treated it as if it were his own. He replaced Weissmann's name with his own, re-titled the article, and distributed it to lecture attendees for future study in the same fashion as they had done when they previously worked together.

*Weissmann* is inapplicable for several reasons. First, as the District Court noted, the scholarly article Freeman used in *Weissmann* was prepared for the same type of audience and had the "same intrinsic purpose" as his former colleague's use. (SPA34). Therefore, in contrast to Hoiland's distinctly different and thus transformative use of the Text, the Second Circuit in *Weissmann* found that Freeman's use of the article for the "same intrinsic purpose" as Weissmann "seriously weakens a claimed fair use." In addition, Hoiland did not claim to be the author of the Text or any Materials; rather, she identified herself in the Slides as the

42

sole *presenter* of the CCCLA Presentation, and made clear that Wilder (and her NICHE colleagues) developed the Materials. Moreover, the Text is not a scholarly article that would be reviewed, studied and serve as a means of professional advancement; instead, it was a small slice of the NICE project's instructional materials that appeared briefly on a screen as a visual aid.

Unsurprisingly, Hoiland derived no professional benefits from this fleeting use. First, the listing of the CCCLA Presentation on Hoiland's resume is irrelevant because what is at issue here are a few *Slides* – not the fact that Hoiland gave an authorized *presentation* about NICE. In addition, there is no evidence that the lone reference to the CCCLA among dozens of references on her multi-page CV had any impact on Hoiland's career. Furthermore, Hoiland did not get contact information and has not subsequently been in touch with any of the 12-20 attendees of her presentation.

Finally, Wilder incorrectly contends that Hoiland advanced her career by "publishing her PowerPoint to 237 attendees" at the CCCLA. (Wilder Br. 59.) In fact, there is no evidence that even a single conference attendee downloaded the Slides or otherwise viewed them (except in the breakout session). Nor is there reason even to suspect that conference attendees viewed the Slides outside of the breakout session. As noted, this was not an article or a paper; rather, the Slides were just

43

visual aids and attendees would have no reason to view them outside of the CCCLA Presentation itself.

## B.    The Nature of the Copyrighted Work

The second factor of the fair use analysis considers "the nature of the copyrighted work." 17 U.S.C. § 107(2).  As the District Court noted, this factor asks "whether the copyrighted work is, essentially, factual or fictional in nature, with greater copyright protection generally given to fictional works."   (SPA36). Specifically, in assessing this factor, this Court considers "(i) whether the work is expressive or creative, with greater leeway being allowed to a claim of fair use where the work is factual or informational; and (ii) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower."  *Hachette Book Grp., Inc.*, 115 F.4th at 187.  Because the Text is not a work of fiction, and it has been published, this factor also weighs in Hoiland's favor.  Wilder does not contend otherwise.

## C.    The Amount and Substantiality of the Portion of Use

The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).  In general, "a finding of fair use is more likely when small amounts, or less important passages of the work are copied than when the copying is extensive, or encompasses the most important parts of the original." *Hachette Book Grp., Inc.*, 115 F.4th at 187-88.

Nevertheless, as the District Court noted, utilizing a large percentage of a work is not dispositive, as courts in certain instances have found copying of an entire work to constitute a fair use. (SPA32). *See, e.g.*, *Bill Graham*, 448 F.3d at 613 (noting that "courts have concluded that such copying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use . . ."). Accordingly, inquiry into the third factor "must take into account that . . . 'the extent of permissible copying varies with the purpose and character of the use." *Id.* at 613.

Here, Hoiland used approximately two-thirds of the Text. However, two additional factors must be considered. First, as the District Court noted, Hoiland removed about one-third of the work, primarily the step-by-step instructions and other information that would have been essential for individuals who were actually taking the course. By removing the portions designed "to guide CUNY faculty members enrolled in NICHE/NICE to draft their own assessment instruments," Hoiland removed the "heart" of the work under Wilder's original use. In addition, in assessing the scope of permissible copying and the substantiality of the portion of use, one must also consider that the work only appeared briefly on a screen during the breakout session and then was quickly removed. This limited use decreases the impact, and thus the substantiality, of the portion of the use. The third factor is neutral as between Hoiland and Wilder.

45

### D.    <u>The Effect of the Use Upon the Potential Market or Value</u>

The final fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "This factor focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy rather than the original." *Hachette Book Grp., Inc.*, 115 F.4th at 189; *see also Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013) (emphasizing that this factor focuses on "whether the secondary use usurps the market of the original work"). In order for there to be "an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original . . . [t]here must be a meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'" *Authors Guild*, 804 F.3d at 224.

The District Court properly concluded that the fourth factor tilted heavily in Hoiland's favor because her use had "little or no effect on the limited market" for the Unit 7H Text. At bottom, this is common sense. No more than 20 community-college professors saw the Text, which was briefly flashed on a screen during a session focused on other matters. Those individuals were *not* told that Hoiland wrote the Text; rather, they were informed that the Materials predated Hoiland's involvement and that Wilder was the driving force behind NICHE and NICE. There

is no evidence that the Slides were downloaded at all. There is no evidence that anyone other than the 12-20 attendees ever even saw the Text. More than five years later, there is no evidence that Hoiland's use had *any* impact on the market for Hoiland's work. Wilder's argument to the contrary amounts to sheer speculation.

Recognizing the lack of market harm, Wilder desperately argues that, under *Weissmann*, she has "*no duty* to show harm to the potential market" under the "unique setting of this case." (Wilder Br. 63 (emphasis in original).) But *Weissmann* does not support that proposition. As discussed, the defendant in *Weissmann* distributed the article in the same manner that the plaintiff would have, thereby harming her prospects for promotion and advancement and cutting her off from a portion of their specialized scholarly market. This Court recognized that the defendant *had* created a competing substitute and *caused harm*, holding that his planned use of the article for the "same intrinsic purpose" "undermine[d] Dr. Weissmann's ability to enjoy the fruits of her labor" and created "a distinct disincentive for her to continue to research and publish in the field of nuclear medicine." *Weissmann*, 868 F.2d at 1326.

Thus, *Weissmann* does not help Wilder's cause and she must – but cannot – show harm to the potential market. Wilder continues to speculate that Hoiland's use of the Text might somehow impede her ability to commercialize the NICHE/NICE curriculum in a textbook. She criticizes the District Judge for noting that she only

47

owns a small portion of the NICHE materials, and she points out that she could overcome that "roadblock" by licensing all the other materials. But even if she could license all the other materials (the record offers no such support), she still has no evidence – just speculation – that Hoiland's use would harm her efforts at commercialization.

Finally, Wilder argues that Hoiland's use of the Text at a professional conference somehow prevents Wilder from "publishing" Unit 7H at academic conferences. But this is simply untrue. Unlike the article at issue in *Quinto v. Legal Times of Washington, Inc.*, 506 F. Supp. 554 (D.D.C. 1981), the Unit 7H Text is not a scholarly article that can only be published once. Indeed, it is not a scholarly article or paper at all. As discussed at length, the Text is a guide for producing assessment instruments, and Wilder can "publish" and re-publish the text at multiple academic conferences without any impediments.

Wilder's various arguments lack merit, and review and balancing of the four factors establishes Hoiland's affirmative defense of fair use as a matter of law.

## III. This Court Should Affirm the Decision on the Separate Ground That Hoiland Possessed an Implied License to Use the Course Materials in Presentations about NICE

This Court should affirm the District Court's grant of summary judgment on the alternative ground that Hoiland possessed an implied license to use the Materials, including the Text, in presentations about NICE.

48

## A.     This Issue May Properly be Considered on Appeal

The Supreme Court has recognized that "[a]n appellee who does not take a cross-appeal may 'urge in support of a decree any matter appearing in the record' . . . ." *Jennings v. Stephens*, 135 S. Ct. 793, 798 (2015) (citations omitted). Furthermore, cases in this Circuit "conform to the general rule that the appellee may seek to sustain a judgment on any grounds with support in the record." *Int'l Ore & Fertilizer Corp. v. SGS Control Servs.*, 38 F.3d 1279, 1286 (2d Cir. 1994) (collecting cases); *Drax v. Reno*, 338 F.3d 98, 105-06 (2d Cir. 2003) (affirming on alternate grounds that were the basis of earlier district court opinion in action).

This Circuit has used the terms "inveterate and certain" to characterize the general rule "that a party need not cross-appeal in order to assert an alternate ground based on the record to support a district decree." *Jenkins v. City of N.Y.*, 478 F.3d 76, 86 n.6 (2d Cir. 2007) (citations omitted). Because a party cannot appeal from a judgment in its favor to obtain review of findings it considers erroneous, it can only advance an alternative argument in response to its adversary's appeal. *See id.* Accordingly, this Court may consider in the context of this appeal whether the record establishes that Hoiland possessed an implied license to use the Materials, including the Text, in conference presentations.

49

**B.** **Hoiland Possessed an Implied License to Use the Course Materials**

It is well established that "nonexclusive licenses may be granted orally, or may even be implied from conduct." *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998). "A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *Id*. at 236. Although this Court has not yet developed a test for determining when a copyright owner has granted an implied license, courts have looked to whether there was a "meeting of the minds between the parties to permit the particular usage at issue." *See, e.g.*, *Baker v. Weber*, 2021 U.S. Dist. LEXIS 188544, at \*25 (S.D.N.Y. Sept. 30, 2021).

To assess whether such a meeting of the minds has occurred, courts look to whether "the totality of the parties' conduct indicates an intent to grant permission to use the copyrighted work." *Jose Luis Pelaez, Inc. v. McGraw-Hill Global Educ. Holdings LLC*, 399 F. Supp. 3d 120, 141 (S.D.N.Y. 2019); *see also Baker*, 2021 U.S. Dist. LEXIS 188544, at \*27. When an owner's conduct "clearly manifests a consent to [the] use of copyrighted material, the owner impliedly grants a nonexclusive license." *Id.*; *see also MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1216 (11th Cir. 2021). The focus is on the licensor's "objective intent . . . as manifested by the parties' conduct." *Jose Luis Pelaez, Inc.*, 399 F. Supp. 3d at 141.

Consistent with this principle, courts routinely assess the parties' conduct and find implied licenses to exist where an owner provides copyrighted material to another party for a particular purpose, and the receiving party uses the material consistent with that purpose. *See, e.g.*, *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (implied license: owner provided special effects for use in horror movie; producer used effects in movie); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir.1996) (implied license: architect provided designs for use in project; and customer used designs in final project); *Latour v. Columbia Univ.*, 12 F. Supp. 3d 658, 662 (S.D.N.Y. 2014) (implied license: owner provided written proposal to university to create post-graduate program; university used proposal in marketing the post-graduate program); *Fontana v. Harra*, 2013 U.S. Dist. LEXIS 35067, at *27-28 (C.D. Cal. Mar. 12, 2013) (implied license: owner delivered screenplay for potential use in creating and promoting film; defendants proceeded to promote film by shopping it to potential investors).[3]

Applying these principles, Hoiland possessed an implied license. Wilder provided the Materials for, among other reasons, Hoiland's use in presentations at professional conferences about NICE, and Hoiland used the Materials in a presentation about NICE. More specifically, the undisputed facts establish that: (1)

---

[3] *See also Zappa v. Rykodisc, Inc.*, 819 F.Supp.2d 307, 318-20 (S.D.N.Y. 2011); *Falcon Enterprises, Inc. v. Publishers Service, Inc.*, 438 Fed. Appx. 579 (9th Cir. 2011); *Lulirama Ltd. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 879-81 (5th Cir.1997); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752-53 (11th Cir.1997).

Wilder recruited Hoiland to serve as the co-Director of NICE and the PI at Hostos; (2) the NICE project consisted primarily of an online faculty development course; (3) Wilder provided the Materials, including the Unit 7H Text, for use as *the* instructional materials for NICE; (4) Wilder was the primary author of the NSF Proposal that led to the NICE project's being funded; (5) the NSF Proposal specifically provided that Hoiland would "present at professional conferences," including national conferences outside of New York and community-college conferences; (6) after serving as co-Director and PI for more than two years, Hoiland presented about the NICE project at a community-college conference in Florida; and (7) Hoiland used portions of the Materials as visual aids for her presentation.

Under these circumstances, Wilder's contention below that Hoiland did not possess an implied license is baseless. As co-Director of NICE and PI at Hostos, Hoiland did not report to Wilder or otherwise require her consent or approval to carry out her responsibilities. Hoiland was required to give presentations about the NICE project, an online faculty development course, and, for all practical purposes, the Course Materials *were* the NICE project. Accordingly, Hoiland had discretion to use the Materials, including the Text, in a conference presentation (that was roughly analogous to a sparsely attended CLE session). And Hoiland's discretion to do so flowed directly from Wilder's conduct in recruiting Hoiland, providing the Materials for Hoiland's use, and drafting the NSF Proposal that both gave Hoiland

her authority and set forth her obligations under the grant. Wilder's conduct *objectively* manifested consent to use the Materials, including the Unit 7H Text, thereby impliedly granting a nonexclusive license.

In the District Court, Wilder claimed that she did not grant an implied license because, in her view, the NSF Proposal limited Hoiland to presenting "research results" and required the Materials to remain under lock and key as part of an "encrypted CUNY faculty program." This is nonsense. The NICE project was an effective faculty development program, and one of its public-grant-justifying selling points was that the training program – the Materials – could be adapted or otherwise used to serve faculty members outside CUNY. Accordingly, the grant earmarked $7,000 in travel expenses for Hoiland to present at professional conferences to promote the NICE project as a whole. (JA533). Nothing in the NSF Proposal limited in any way Hoiland's discretion as a co-Director and PI to use the Materials in her presentations about NICE.

Quite the opposite, the NSF Proposal emphasizes an intent to make the Materials widely available. The "Broader Impacts" section of the "Project Summary" states: "NICE will also help faculty beyond CUNY. First, the project intervention and materials, including the NICE training program and the instructional materials that faculty develop, will be made readily available on the NICE project website." (JA534). Even if Wilder reneged on her obligation to make

53

the "NICE training program" – the Materials – available on the project website, she cannot disavow the stated *goal* of making the Course Materials readily available. Nor can she dispute that the Broader Impacts section provided for presentations to be made at conferences to "ensure that the NICE materials [referring to *both* the Materials and faculty instructional materials] and evaluation results are widely available to educators, policymakers, administrators, and researchers." (JA534).

In the District Court, Wilder also focused on the statement in the Project Summary that the "results will be presented at conferences" to argue that only research results – not the Materials – could be used in conference presentations. The research concerned evaluating the effectiveness of the program (through testing, surveys, and anecdotal evidence) on topics such as whether faculty Participants improved their own QR skills; placed greater emphasis thereafter on QR in their course instruction; and became familiar with new strategies for teaching QR. (JA650). But the statement about presenting results is not framed as a limitation or restriction on use of the Materials; to the contrary, a specifically stated purpose of presenting the results was to ensure that the Materials were "widely available." Moreover, even if (as is not the case) Hoiland had been required to present narrowly on "results," such a requirement would also imply a license to use the Materials in conference presentations because the results are meaningless without discussion of the NICE project itself and its Materials. (JA650-51).

54

At bottom, Wilder knows that Hoiland was authorized to *use* the Course Materials; what she is really complaining about is the way Hoiland used them. She objects to Hoiland's allegedly using the Text out of context; using direct quotes from the Text; and allegedly using the Text without giving her proper credit. But Hoiland has established the existence of an implied license to use the Materials in the Slides. As a result, and contrary to Wilder's stated position in the District Court, the burden shifts to Wilder to establish – as in an ordinary copyright infringement case – that the allegedly infringing use was outside the scope of the license. *See Graham v. James*, 144 F.3d 229, 236 (2d. Cir. 1998) (addressing an implied license: "when the contested issue is the *scope* of a license, rather than the *existence* of one, the copyright owner bears the burden of proving that the defendant's copying was unauthorized under the license . . ."); *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995) (holding that in cases where the scope of the license is at issue, "the copyright owner bears the burden of proving that the defendant's copying was unauthorized").

Wilder cannot meet this burden. Wilder never placed any restrictions or requirements, including requirements as to quotes or credit or "context," on Hoiland's use of the Materials. Wilder also cannot establish that Hoiland violated any academic norm or policy that would have required her to provide additional credit beyond the substantial verbal credit she provided during the CCCLA

55

Presentation.  And even if Wilder had raised a genuine issue of fact concerning such a violation or obligation – she has not – she has failed to overcome the strong presumption that failure to meet such an obligation constitutes breach of a covenant, not a condition.[4]

Instead, Wilder desperately argued that there was no "meeting of the minds" because the parties did not agree on all the "essential terms"; and then, in essence, she defined as essential each of the restrictions that she could have imposed – but failed to impose – upon Hoiland.  This argument has no merit.  Perhaps the parties did not agree on all the terms that Wilder considered to be essential.  But what Wilder subjectively "considered" or considered "essential" is not the issue.  By her objective

---

[4]     The law distinguishes between "conditions and "covenants" – "if the licensee's improper conduct constitutes a breach of a covenant undertaken by the licensee, and if such covenant constitutes an enforceable contractual obligation, then the licensor will have a cause of action for breach of contract, not copyright infringement." *See Graham*, 144 F.3d at 236-37.  There is generally a "presumption that terms of a contract are covenants rather than conditions."  *Id.*  To the extent Hoiland was somehow contractually obligated to provide written credit, it was a covenant, not a condition.  The NICE project had a goal of disseminating the Materials, including through conference presentations, but there is no evidence that Hoiland's use of the Materials was conditioned on providing Wilder with credit.  Thus, any purported requirement of written credit would constitute a contractual covenant, and Wilder would be limited to a breach-of-contract.  *See, e.g.*, *id.* at 237 (holding that "inclusion of a notice crediting . . . authorship" is a covenant, not condition); *Grand Union Co. v. Cord Meyer Dev. Co.*, 761 F.2d 141, 147 (2d Cir. 1985); *see also Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 754 (11th Cir. 1997) ("public recognition of authorship" was not a condition because author "granted . . . permission to play the song before . . .  recognition [was] received").

*conduct*, Wilder granted an implied license to use the Materials, including the Unit 7H Text, in the Slides. Accordingly, for this alternative reason, the District Court's Opinion should be affirmed.

## IV. The District Court Did Not Err in Holding that Wilder Failed to Establish Copyright Ownership

Wilder contends that the District Court erroneously denied her summary judgment motion as to ownership because, according to Wilder, the District Court "confused the burden of proof." This argument is meritless, as Wilder's argument incorrectly implies that *Hoiland* is required to prove that Wilder is *not* the owner of the copyright, when in fact *Wilder* bears the burden of proving that she *is*.

The plaintiff bears the burden of proving copyright ownership. *Int'l Media Films, Inc. v. Lucas Entm't, Inc.*, 703 F. Supp. 2d 456, 462 (S.D.N.Y. 2010); *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003). Wilder submitted evidence purporting to establish ownership, and she failed to meet her burden. In fact, the evidence submitted by Wilder demonstrates that she created the Materials in her capacity as an employee of the City University of New York, which would make CUNY the copyright owner as a matter of law. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) ("If a work is for hire, the employer . . . owns the copyright"). This is consistent with the copyright notice Wilder submitted. The notice did not identify Wilder as the owner; instead, it stated that "the presentation is owned by CUNY NICHE." (SPA22). Moreover, as the District

Court noted, "the NICHE and NICE abstracts in the record unambiguously state that the Research Foundation of the City University of New York is the awardee or recipient of the NSF grants (not Wilder and/or Hoiland individually). (SPA22; JA179).

Wilder inappropriately asks the Court to excuse her own evidentiary failings because Hoiland did not assert a "work for hire" affirmative defense. This is a red herring. Wilder had the burden of establishing ownership. Instead, she submitted evidence suggesting that ownership is vested in CUNY.

Moreover, Hoiland also submitted evidence concerning Wilder's lack of ownership that was sufficient to raise a genuine issue of material fact. For example, Hoiland submitted an NSF Project Outcomes Report identifying the Research Foundation of CUNY as the recipient of the NICE grant (JA381), as well as a slide deck bearing a copyright notice "nearly identical" to the notice Wilder submitted (that did not list Wilder as the copyright holder). (SPA26). Moreover, Hoiland stated in her declaration that the notice was "generally consistent with how I viewed the Materials in early 2019. . . . I would have thought . . . that the Course Materials were owned by the NICE Project itself." (JA552).

And even when a party fails to submit any evidence at all, courts may deny summary judgment where the moving party fails to meet its burden of proof. "The party moving for summary judgment bears the initial burden of informing the court

of the basis for her motion and identifying those portions of the 'pleadings, the discovery and disclosure materials on file, and any affidavits' that demonstrate the absence of a genuine issue of material fact." *Huurman v. Foster*, 2010 U.S. Dist. LEXIS 61454, at *19-20 (S.D.N.Y. June 21, 2010) (citing Fed. R. Civ. P. 56(c)); *see also Disney Enters. v. Sarelli*, 2018 U.S. Dist. LEXIS 168268, at *4-5 (S.D.N.Y. Sept. 26, 2018) (rejecting argument that court improperly considered issues "sua sponte" in granting summary judgment, where issues concerned the "touchstone" of the claims). "If the movant fails to meet her initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial." *Huurman*, 2010 U.S. Dist. LEXIS 61454 at *19-20 (denying summary judgment on copyright claims even though *pro se* defendant did not file an opposition brief). Thus, the Court properly denied Wilder's summary judgment motion on ownership, *regardless* of whether Hoiland formally challenged ownership or asserted a work-for-hire affirmative defense.

## V. This Court Should Reverse the District Court's Erroneous Denial of Attorney's Fees to Hoiland

The District Court abused its discretion in declining to award Hoiland attorney's fees.

**A.** <u>**The Evidence Established That Hoiland Was Entitled to Attorney's Fees**</u>

Section 505 of the Copyright Act empowers the Court to award attorneys' fees and costs to prevailing parties. While "[t]here is no precise rule or formula" and courts have "broad leeway" in attorneys' fees determinations, the Supreme Court has "noted with approval 'several nonexclusive factors' to inform a court's fee-shifting decisions: 'frivolousness, motivation, objective unreasonableness[,] and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016). A district court abuses its discretion to deny attorneys' fees where such a decision is based on "a clearly erroneous assessment of the evidence." *Kerin*, 218 F.3d at 188-89.

Here, each of the relevant factors weighs in favor of granting the motion and awarding attorney's fees. Thus, the District Court's contrary decision is based on a "clearly erroneous assessment of the evidence." *See id.*

    i.    <u>Wilder's Copyright Claim Was Objectively Unreasonable</u>

Wilder's assertion that Hoiland infringed her copyright by using certain instructional materials in the educational, non-commercial context of a small presentation during a breakout session at an academic conference was objectively unreasonable because, as the District Court determined in granting summary judgment, the use was clearly a fair use. As the Court explained in its well-reasoned

60

Opinion, "no *reasonable* factfinder could find that the affirmative defense of fair use had not been established by Hoiland." (SPA1). Although the grant of summary judgment does not "automatically entitle" Hoiland to a fee award, it strongly supports a finding of objective *unreasonableness*, particularly because the affirmative defense of fair use typically presents questions of fact that must be resolved at trial – not on summary judgment. *See Mallery v. NBC Universal, Inc*., 2008 U.S. Dist. LEXIS 20893, at *3 (S.D.N.Y. Mar. 18, 2008).

A finding of objective unreasonableness should be given "substantial weight" when determining whether to award fees, and, furthermore, a finding of objective unreasonableness, standing alone, can be sufficient to warrant a fee award. *See Kirtsaeng*, 579 U.S. at 207-08; *see, e.g.*, *Mallery*, 2008 U.S. Dist. LEXIS 20893, at *2-3; *Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 358 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x 845 (2d Cir. 2007). Although Wilder proceeded in bad faith and her claims were frivolous, it is worth noting that "once the court finds that the plaintiff's claim was objectively unreasonable[,] bad faith or frivolousness is not a prerequisite to an award of fees." *Screenlife Establishment v. Tower Video, Inc.*, 868 F. Supp. 47, 52 (S.D.N.Y. 1994); *Chivalry Film Prod's v. Ardito*, 2007 U.S. Dist. LEXIS 86889, at *4 (S.D.N.Y. Nov. 27, 2007), *cert. denied*, 128 S. Ct. 2064 (2008).

The objective unreasonableness – indeed, the frivolousness – of Wilder's claim is perhaps best shown by simply stating once again what happened here: Hoiland, the Principal Investigator at Hostos on an NSF-funded program, spoke to fewer than 20 community-college educators at a conference, as she was required to do under the terms of the grant application that Wilder authored. Hoiland gave an overview of the program, including its benefits and challenges, that was designed to assist attendees in their own coursework, grant-seeking efforts, and careers. She wasn't paid and received no benefits other than the satisfaction of doing educational work in the public interest. She flashed slides on a screen and then "poof" they were gone. Their use had zero impact on Wilder or the market – charitably assuming there is one – for the materials at issue.

And indeed, the District Court's careful analysis of the four-factor fair use test reached the inevitable conclusion – that Hoiland's use of the Unit 7H Text was a fair use because "[t]he use was transformative; it was educational and non-commercial; the work is nonfictional; and the use had little or no effect on the limited market for the work. And . . . [Hoiland] . . . did not use the entirety of the work, and edited the text in a way that was most relevant to her transformative purpose." (SPA44-45).

Wilder's continued pursuit of her claim, including by pursuing this appeal and making a Second Circuit case out of Hoiland's obvious fair use, was, and continues

to be, objectively unreasonable. Accordingly, and based on this factor alone, Hoiland is entitled to attorney's fees.

ii.    <u>Plaintiff's Improper Motivation Supports a Fee Award</u>

In bringing and relentlessly pursuing this action, Wilder was motivated by a bad-faith desire to tarnish Hoiland's professional reputation, derail her career prospects, and otherwise punish her for (properly) using the Unit 7H Text. "Generally speaking, someone is improperly motivated when the claim is asserted not because of the inherent merit of the claim, but rather because of some ulterior motive." *Leary v. Manstan*, 2018 U.S. Dist. LEXIS 49939, at *7-8 (D. Conn. Mar. 27, 2018). "[T]he presence of improper motivation in bringing a lawsuit or other bad faith conduct weighs heavily in favor of an award of costs and fees." *Hughes v. Benjamin*, No. 17-cv-6493, 2020 U.S. Dist. LEXIS 139698, at *9-11 (S.D.N.Y. Aug. 5, 2020).

Here, the record is replete with evidence of Wilder's improper motivation. Wilder's August 2019 emails betray an irrational fear that her junior colleague was "trying to take over" the NICE project and deprive her of the fruits of her professional labor, and there was nothing Hoiland could do to placate her. (SPA9-14). When Wilder complained that she did not receive proper "credit," Hoiland assured her that she received significant verbal credit, apologized to Wilder (though no apology was necessary) for not identifying her by name on the slides for the

CCCLA presentation, and, as the District Court noted, "took steps to add Wilder's name to the CCCLA website within days of Wilder's request for her to do so." (SPA35-36, n. 21; *see also* SPA8, 12-13). But that wasn't enough.

Wilder then filed a formal complaint against Hoiland and hurried to do so because she *specifically* wanted to stop Hoiland's promotion in its tracks. (SPA15). A CUNY RIO fully investigated Wilder's allegations and ultimately determined that Hoiland had not engaged in "plagiarism" or other research misconduct. (SPA15-16). But that still wasn't enough.

Having failed to thwart Hoiland's promotion to an Associate Professor position (though she succeeded in slowing down the process), Hoiland commenced this lawsuit fewer than three months after it was announced that Hoiland (through the Research Foundation of the City University of New York) had received a $2.3 million grant to serve as the Principal Investigator on the HOPE project. (JA654-55). Because "plagiarism" allegations are a significant concern in academia (and elsewhere), the very existence of this lawsuit placed a professional "black cloud" over Hoiland, which only began to lift after the District Court's decision was released. And as further evidence of Wilder's bad faith, she steadfastly refused to settle this Action, despite countless discussions and the efforts of three mediators (including the Second Circuit's mediator), because she insisted on receiving from

64

Hoiland an explicit or implicit admission of wrongdoing, which she would then presumably use to further damage Hoiland's professional reputation.[5]

Accordingly, Wilder litigated with an improper motive, a fact that further supports this Court's granting Hoiland an award of attorney's fees and costs. *See, e.g.*, *Hughes*, 2020 U.S. Dist. LEXIS 139698, at *11 (awarding fees and finding improper motive in plaintiff's intent to "inflict financial harm" on defendant and to "raise her own profile in the process").

### iii. Issuing an Award to Hoiland Serves the Goals of Compensation and Deterrence

As the District Court found in granting summary judgment, Hoiland's fair use of educational course materials at an academic conference benefitted the public interest. As such, awarding her fees serves important goals: compensating her (and her attorneys) for presenting a meritorious fair use defense and deterring Wilder (and those like her) from asserting meritless copyright claims aimed at curtailing educational advancement and collaboration. "Compensation and deterrence . . . exist for the dual purposes of incentivizing parties with strong claims to litigate them and deterring parties with weak claims from embarking on wasteful litigation." *Walsh*, 2022 U.S. Dist. LEXIS 79444, at *8 (citations omitted). As the Supreme

---

[5] A court may properly consider evidence regarding settlement negotiations in assessing an attorney's fees motion. *See, e.g., Walsh v. Townsquare Media, Inc.*, 565 F. Supp. 3d 400, 404 (S.D.N.Y. 2021).

Court has made clear, "a defendant seeking to advance meritorious copyright defenses should be encouraged to litigate them." *Fogerty*, 510 U.S. at 527; *Kirtsaeng*, 579 U.S. at 206. And it is well-settled that an essential goal of copyright law is to "enrich[] the general public through access to creative works." *Id.* at 204 (citing *Fogerty*, 510 U.S. at 527); *see* U.S. Const., Art. I, §8, cl. 8 ("To promote the Progress of Science and useful Arts").

As the District Court explained, "Courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest." (SPA29.) Here, Hoiland's use of the Unit 7H Text in a community-college conference presentation did just that – it benefitted the public interest in advancing educational efforts directed toward an underrepresented group: community college students. In particular, Hoiland's use was merely part of a "much larger story" at a presentation with the objectives of "shar[ing] best practices in faculty development related to assessment," disseminating assessment results of the faculty development program, and "discuss[ing] the challenges and successes related to assessment in the community college context." (SPA30.) Following the presentation, Hoiland engaged in a "lengthy question-and-answer session," during which the audience of "predominantly community college faculty" asked questions about broader educational issues, including recruiting faculty and "best practices related to . . . working with a four year institution." *Id.* Hoiland's presentation sparked a vibrant

discussion with the community-college attendees about how to recruit and motivate faculty in professional-development programs. *Id.* at 30-31. Awarding Hoiland fees thus serves to compensate her and her counsel for presenting a meritorious fair use defense and to deter meritless affirmative claims which, if successful, would hinder copyright law's critical objective of contributing to public knowledge. Granting attorney's fees to Hoiland will "deter this [P]laintiff, and other similarly situated plaintiffs, from bringing unreasonable claims based on a cost/benefit analysis that tells such plaintiffs that they can score big if they win and that there will be no adverse consequences if they lose." *Baker*, 431 F. Supp. 2d at 359; *see also Mahan v. Roc Nation, LLC,* 634 F. App'x 329, 331 (2d Cir. 2016) ("[A]warding fees would deter similar frivolous suits from being filed by others.").

Moreover, as explained above, Wilder's claim was objectively unreasonable and motivated by improper factors, which further supports a finding that an award to Hoiland would serve the goals of deterring similarly situated plaintiffs. *See Walsh*, 2022 U.S. Dist. LEXIS 79444, at *8 (noting that the court's "finding on those two factors [] supports a finding in Defendant's favor" on the compensation-and-deterrence factor).

In addition, we note that the goal of providing compensation is not tied to whether a prevailing party actually suffered financial harm and, thus, the fact that Hoiland was represented on a *pro bono* basis for the majority of this action does not

preclude an attorney's fees award. *Cf. Hughes*, 2020 U.S. Dist. LEXIS 139698, at *12-13 ("Put simply, a litigant's good luck in having the financial wherewithal to defend against a frivolous suit – whether because of insurance, a GoFundMe campaign, a rich uncle, or a pro bono lawyer – does not automatically immunize the losing party from the consequences of her actions."); *see also TigerCandy Arts, Inc. v. Blairson Corp.*, 2012 U.S. Dist. LEXIS 35269, at *30 (S.D.N.Y. Feb. 23, 2012) (awarding attorneys' fees under the Copyright Act where party was represented by *pro bono* counsel); *Vargas v. Transeau*, 2008 U.S. Dist. LEXIS 59344, at *9-11 (S.D.N.Y. Aug. 6, 2008) (same); *Blue Moon Media Grp., Inc. v. Field*, 2011 U.S. Dist. LEXIS 108066, at *25-26 n.3 (E.D.N.Y. Apr. 11, 2011) (same).

In fact, and quite the opposite, the circumstances surrounding Davis+Gilbert's representation of Hoiland on a *pro bono* basis provide strong, *additional* support for an attorney's fees award. Hoiland initially appeared *pro se* in the underlying action, with Davis+Gilbert providing periodic behind-the-scenes advice and receiving payment for its services. (JA656). However, as a result, in part, of Wilder's counsel's aggressive litigation tactics – such as, for example, serving unduly burdensome requests for admission – Davis+Gilbert concluded that Hoiland was unable to effectively represent herself. (*Id.*) Therefore, and because Hoiland lacked the financial resources to fund the effective defense that she deserved, Davis+Gilbert chose in October 2022 to appear on Hoiland's behalf and represented her for the

68

remainder of the litigation on a *pro bono* basis. (JA656-57). For the same policy reasons described above, *pro bono* counsel should be encouraged to litigate cases with meritorious defenses, and Davis+Gilbert should be compensated for having done so here. An award of attorney's fees for presenting a meritorious fair-use defense aligns with advancing the goal of the Copyright Act to enrich the public through access to original, copyrighted works.

In sum, because each of the factors weigh in favor of granting attorney's fees to Hoiland, the District Court's finding to the contrary was an abuse of discretion.

### B.   The District Court Failed to Adequately Explain Its Denial of Hoiland's Motion for Attorney's Fees

Even if the District Court's decision not to award attorney's fees was not against the clear weight of the evidence (which to be clear, it was), the decision should *still* be reversed because the District Court did not adequately explain its reasoning.

Although a district court's decision not to award attorney's fees under the Copyright Act is reviewed for abuse of discretion, that discretion is not unlimited. This Court has instructed that "abuse of discretion is not the equivalent of unreviewable," and mandates that "whichever way it exercises its discretion, a district court should make specific findings regarding the matter." *See In Re Bolar Pharmaceutical Co. Securities Litig.*, 966 F.2d 731, 732 (2d Cir. 1992);

*International Brotherhood of Teamsters, Joint Council 18 v. New York State Teamsters Council Health and Hospital Fund*, 903 F.2d 919, 924 (2d Cir. 1990).

The District Court made no such specific findings here. Rather, the District Court merely identified the factors to be considered, and stated in conclusory fashion that "here, the circumstances that courts within the Second Circuit have found to justify an award of attorneys' fees are not present." (SPA54-55). This is insufficient. *See Orchano v. Advanced Recovery, Inc.,* 107 F.3d at 99 ("A recitation of the applicable factors or legal standard, standing alone, is normally not sufficient to permit appropriate appellate review. The court must inform the reviewing court as to how the standard has been applied to the facts as the court has found them."). The District Court then identified two cases (*Baker v. Urban Outfitters*, 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2007) and *Video-Cinema Films, Inc. v. Cable News Network, Inc.*, 2003 WL 1701904, at *4 (S.D.N.Y. Mar. 31, 2003)) where a district court awarded attorney's fees, and reasoned that this case "does not present similar facts of bad faith, objective unreasonableness, or other factors warranting the need for an award of fees and costs to Hoiland." (SPA56). This is also insufficient because the District Court failed to explain how the facts of *this* case do not merit an award of attorneys fees. Simply put, it was error for the District Court to deny Hoiland's attorney's fees application based solely on its apparent belief that Wilder's actions weren't quite as bad as the very-very-bad actions of the parties in *Baker* and *Video-*

70

*Cinema Films*. The District Court's denial of Hoiland's motion should therefore be reversed and remanded for further proceedings.

## CONCLUSION

For the foregoing reasons, Dr. Sarah Hoiland respectfully requests that the Court affirm the well-reasoned Opinion of the District Court concluding that Hoiland's use of the Unit 7H Text was a fair use. The Court should also affirm the grant of summary judgment for Hoiland on the alternate ground that Hoiland possessed an implied license to use the Unit 7H Text in conference presentations. This Court should also reverse the decision of the District Court denying Hoiland's motion for an award of attorney's fees and remand to the District Court for further proceedings.

Dated: New York, New York      Respectfully submitted,
       November 4, 2024

                             **DAVIS+GILBERT LLP**

                             By:  */s/ Guy Cohen*
                                 Guy Cohen
                                 Danielle C. Zolot
                                 1675 Broadway
                                 New York, New York 10019
                                 (212) 468-4800
                                 gcohen@dglaw.com
                                 dzolot@dglaw.com

                               *Attorneys for Dr. Sarah Hoiland*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of Second Circuit Local Rule 28.1.1(b) because this brief contains 16,367 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I further hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word Version 2401 in Times New Roman size 14-point font.


*/s/ Guy Cohen*
Guy Cohen