# 24-1436 (L)

## 24-1567 (XAP)

## In the United States Court of Appeals for the Second Circuit

ESTHER WILDER,
PLAINTIFF-APPELLANT-CROSS-APPELLEE

*v.*

SARAH HOILAND,
DEFENDANT-APPELLEE-CROSS-APPELLANT

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 22-721)*

**RESPONSE AND REPLY BRIEF OF APPELLANT-CROSS-APPELLEE ESTHER WILDER**

MATTHEW HERSH
MESTAZ LAW
5090 N. 40th Street
Suite 200
Phoenix, AZ 85018
(602) 806-2068

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

SUMMARY OF ARGUMENT ...................................................................... 1

ARGUMENT ...................................................................................................... 5

I.    NO REASONABLE JURY COULD FIND THAT HOILAND'S USE OF WILDER'S WORK WAS COVERED BY AN IMPLIED LICENSE ................................................................................. 5

    A.    Supplemental Statement of Facts Relating to the Issue of Implied License. ...................................................... 5

    B.    In Order for a License to Be Implied, There Must Be a "Meeting of the Minds" Over the Existence and Scope of Such a License. ........................................................ 13

    C.    No Reasonable Jury Could Find That Hoiland Met Her Burden of Proving That There Was a "Meeting of the Minds" Over Hoiland's Right to Use Wilder's Material for Her Own Professional Benefit. ......................... 23

    D.    Hoiland has no meaningful arguments against the law and objective facts above. ...................................... 30

    E.    Even If the Court Does Not Feel Wilder Is Entitled to Summary Judgment on the Implied License Affirmative Defense, It Should Remand to the District Court With a Ruling That Hoiland Is Also Not Entitled to Summary Judgment. ..................................................................... 38

II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR HOILAND ON HER AFFIRMATIVE DEFENSE OF FAIR USE. .................................................................. 38

    A.    Factor One, the Purpose and Character of Hoiland's Use, Weighs Against Fair Use Because Hoiland Did Not Transform Wilder's Work and Because Hoiland's Non-Profit Educational Purpose Does Not Outweigh the Lack of Transformative Use. ........................................ 38

        1.    Hoiland's argument about implied license cannot do double duty here. ..................................... 38

      2.    Hoiland did not make a transformative use of Wilder's work. ..............................................................39

      3.    Hoiland's non-commercial educational purpose does not outweigh the non-transformative nature of her copying. ..............................................................46

    B.    Factor Three, the Amount and Substantiality of the Taking, Weighs Heavily Against Fair Use Because Hoiland Took the Heart of Wilder's Work. ........................48

    C.    Factor Four, The Effect on Wilder's Academic Career and Professional Opportunities, Weighs Against Fair Use Because Hoiland's Use of the Course Materials Undercut Wilder's Ability to Make the Same Use. .............49

III.   THE DISTRICT COURT ERRED IN DENYING WILDER'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF OWNERSHIP. ...............................................................51

IV.   THE DISTRICT COURT CORRECTLY EXERCISED ITS DISCRETION TO DENY ATTORNEY FEES. ............................52

    A.    Wilder's Claim Was Objectively Reasonable. .......................53

    B.    Wilder's Lawsuit Was Not Motivated by Bad Faith............58

    C.    Issuing an Award to Dr. Hoiland Will Not Serve the Goals of Compensation and Deterrence................................64

CONCLUSION ...................................................................66

CERTIFICATE OF COMPLIANCE ........................................67

CERTIFICATE OF SERVICE.................................................68

# TABLE OF AUTHORITIES

**Cases**

*ABKCO Music, Inc. v. Sagan*, 50 F.4th 309 (2d Cir. 2022). ................... 14

*Agence France Presse v. Morel*, 10 CIV 2730 (AJN), 2015 WL 13021413 (S.D.N.Y. Mar. 23, 2015), *aff'd sub nom. Presse v. Morel*, 645 Fed. Appx. 86 (2d Cir. 2016) ................................................................ 58

*Aitken, Hazen, Hoffman, Miller, P. C. v. Empire Const. Co.*, 542 F. Supp. 252 (D. Neb. 1982) .......................................................... 50

*Alderman v. Pan Am World Airways,* 169 F.3d 99 (2d Cir.1999) (internal quotation marks omitted)................................................ 52

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ........................................................................ 39, 41, 42, 43

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021) ........................................................................ 38

*Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008) (same) . 19

*Atkins v. Fischer*, 331 F.3d 988 (D.C. Cir. 2003) ........................ 18, 19, 28

*Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351 (S.D.N.Y. 2006), *aff'd*, 249 Fed. Appx. 845 (2d Cir. 2007)........................................ 64

*Barcroft Media, Ltd. v. Coed Media Group, LLC*, 16 CIV 7634 (JMF), 2018 WL 357298 (S.D.N.Y. Jan. 10, 2018)............................. 55, 56

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006)................................................................................ 46

*Blanch v. Koons*, 485 F. Supp. 2d 516 (S.D.N.Y. 2007) ................... 56, 61

*Blum v. Stenson*, 465 U.S. 886 (1984) .......................................... 65

*BMS Entm't/Heat Music LLC v. Bridges*, 04 CIV 2584 (PKC), 2007 WL 1989292 (S.D.N.Y. July 6, 2007)...................................... 53

*Bourne v. Walt Disney Co.*, 68 F.3d 621 (2d Cir. 1995) (defendant has "the burden of coming forward with evidence of a license").......... 13

*Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588 (6th Cir. 2008) ................................................................................ 59

iii

*CK Co. v. Burger King Corp.*, 92 CIV 1488 (CSH), 1995 WL 29488 (S.D.N.Y. Jan. 26, 1995)............................................................54, 55

*Crowley v. Jones*, 608 F. Supp. 3d 78 (S.D.N.Y. 2022)............................63

*Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86 (S.D.N.Y. 1996) ....................................................................................14, 17, 18, 27

*Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) .16, 18, 19, 20, 27, 28

*Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821 (9th Cir. 2001) 27

*Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841).........................40, 45

*Goodman v. Universal Beauty Products Inc.*, 17-CV-1716 (KBF), 2018 WL 1274855 (S.D.N.Y. Mar. 9, 2018); ............................................13

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021) ..................................39

*Graham v. Prince*, 15-CV-10160 (SHS), 2023 WL 3383029 (S.D.N.Y. May 11, 2023) ..................................................................................21

*Grant v. Trump*, 20-CV-7103 (JGK), 2024 WL 4179057 (S.D.N.Y. Sept. 13, 2024)...................................................................................47

*Guity v. Santos*, 18 CIV 10387 (PKC), 2020 WL 4340417 (S.D.N.Y. July 28, 2020)...................................................................................55

*Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024)...................................................................................46, 47

*Horror Inc. v. Miller*, 15 F.4th 232 (2d Cir. 2021)...................................51

*Hughes v. Benjamin*, 17-CV-6493 (RJS), 2020 WL 4500181 (S.D.N.Y. Aug. 5, 2020) ..............................................................................59, 65

*In re Bolar Pharm. Co. Sec. Litig.,* 966 F.2d 731 (2d Cir.1992) (per curiam) ...................................................................................53

*Inst. for the Dev. of Earth Awareness v. People for the Ethical Treatment of Animals*, 08 CIV 6195 (PKC), 2011 WL 2565373 (S.D.N.Y. June 14, 2011)...................................................................................55

*Int'l Broth. of Teamsters, Joint Council 18 v. New York State Teamsters Council Health & Hosp. Fund*, 903 F.2d 919 (2d Cir. 1990) .........53

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26 (1st Cir. 2003) ..............................................................................20

iv

*Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998) ....................15, 21, 22, 29

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120 (S.D.N.Y. 2019) .......................................................15

*Jovani Fashion, Ltd. v. Cinderella Divine, Inc.*, 820 F. Supp. 2d 569 (S.D.N.Y. 2011) ....................................................................................54

*Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197 (2016)........53, 59, 61

*Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224 (11th Cir. 2010)........14, 24

*Lava Records, LLC v. Amurao*, 354 Fed. Appx. 461 (2d Cir. 2009) .......53

*Leary v. Manstan*, 13 CIV 639 (JAM), 2018 WL 1505571 (D. Conn. Mar. 27, 2018).................................................................................................58, 61

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 14 CIV 3419 (JMF), 2018 WL 317850 (S.D.N.Y. Jan. 8, 2018), *aff'd*, 764 Fed. Appx. 39 (2d Cir. 2019) .....................................................................................57

*MacLean Associates, Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769 (3d Cir. 1991).........................................................15, 21, 24

*Mahan v. Roc Nation, LLC*, 634 Fed. Appx. 329 (2d Cir. 2016)............64

*Marcus v. Rowley*, 695 F.2d 1171 (9th Cir. 1983) ..................................49

*Nelson-Salabes, Inc. v. Morningside Dev.*, LLC, 284 F.3d 505 (4th Cir. 2002)...................................................................................19, 20, 28

*Oddo v. Ries*, 743 F.2d 630 (9th Cir.1984) .............................................16

*Otto v. Hearst Communications, Inc.*, 17 CIV 4712 (GHW), 2020 WL 377479 (S.D.N.Y. Jan. 23, 2020)......................................................56

*Pavlica v. Behr*, 397 F. Supp. 2d 519 (S.D.N.Y. 2005) (Chin, J.)......25, 26

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 96 CIV 4126 (RWS), 2004 WL 728878 (S.D.N.Y. Apr. 6, 2004) ...................................................................................................54

*Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56 (1st Cir. 2020)...............................................................................15, 17, 22, 24

*Quinto v. Legal Times of Washington, Inc.*, 506 F. Supp. 554 (D.D.C. 1981)...............................................................................................50

*Satchell v. Dilworth*, 745 F.2d 781 (2d Cir. 1984) (cleaned up).............51

*Screenlife Establishment v. Tower Video*, Inc., 868 F. Supp. 47 (S.D.N.Y. 1994) .............................................................................................. 54

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936) ... 45

*SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301 (S.D.N.Y. 2000) ............................................................................................... 17

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 211 F.3d 21 (2d Cir. 2000) (cleaned up) ................................. 13

*TRF Music Inc. v. Alan Ett Music Group, LLC*, 06 CIV 0349 (PKC), 2006 WL 1376931 (S.D.N.Y. May 18, 2006) ................................... 53

*Tsai v. Westcoast Prof'l Group, LLC*, CV 04-9754GHKAJWX, 2005 WL 5714357 (C.D. Cal. Jan. 25, 2005) .................................................. 19

*Viva Video, Inc. v. Cabrera*, 9 Fed. Appx. 77 (2d Cir. 2001) ................... 59

*Walsh v. Townsquare Media, Inc.*, 565 F. Supp. 3d 400 (S.D.N.Y. 2021) ....................................................................................................... 64

*Weissmann v. Freeman*, 684 F. Supp. 1248  (S.D.N.Y. 1988) ................. 49

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) .............. 47, 49, 50

**Statutes**

17 U.S.C. § 201(a) ...................................................................................... 51

**Other Authorities**

Pierre N. Leval, Toward a Fair Use Standard, 103 Harvard L. Rev. 1105 (1990) .................................................................................... 39, 49

vi

## SUMMARY OF ARGUMENT

Hoiland has turned this from a fair use case into an implied license case. In doing so, she has made a hash of the law. She asks this Court to affirm summary judgment on the alternative ground that she had a license to take Wilder's course materials and present them, without Wilder's permission, at an academic conference. She then asks the Court, in what is apparently now just a fallback position, to find that she made a fair use of the course materials because she had that *very same* implied license. In other words: She didn't infringe because she had an implied license. But if she *did* infringe, it's fair use because (you guessed it) she had an implied license. That doesn't make the slightest bit of sense. It is also dead wrong on the law.

If this case is really about implied license (as it now seems to be), then it should end quickly in Wilder's favor. Every traditional implied license factor cuts firmly against Hoiland. Wilder did not sell the course materials for a quick gain, like an architect selling initial drawings or a special effects-maker selling footage. She provided the materials to kick off a multi-year project in which she expected to play (and did play) a multi-year role. Hoiland, meanwhile, is hardly in the position of an

aggrieved movie producer or real estate developer, suddenly held hostage by the contributor of only a small piece of the larger project. She expected to get (and *did* get) the benefits of the program from her three-year role in helping to lead it, not in this one-time presentation of Wilder's work. Wilder is not the tail wagging the dog here.

Many other factors point against an implied license. To begin with, Wilder expressly made clear on project materials that "questions regarding authorization" to use project materials" should be *directed to her*. Hoiland was well aware of that. She even co-presented a paper with *that very same language*. And even the university ethics officer who found (wrongly, but that does not matter here) that Hoiland did not commit academic plagiarism also took pains to note that there was "no previous agreement" on what Hoiland could use and what Hoiland could not. He also told Hoiland that she should do a better job in the future of not using Wilder's work without "proper authorization." There was no meeting of the minds here.

With implied license out of the way, Hoiland's fair use case falls apart quickly. Begin with the first factor, purpose and character of the use. Hoiland tips her hand by making implied license the centerpiece of

her argument about the purpose and character of her use. Without it, she has no meaningful response to Wilder's arguments. In fact, she has *literally* no response to many of Wilder's arguments—neither they nor the caselaw they cite are even mentioned in her brief. Many of her other arguments are just rehashes of what the district court said below. That wastes everybody's time—and advances her case not one iota.

Hoiland's arguments on the other disputed fair use factors are no better. With respect to the third factor, amount and substantiality of the taking, Hoiland took the heart of Wilder's course materials. She left behind only procedural requirements like deadlines and submission instructions—the equivalent of ECF filing requirements in a manual on appellate practice. That was hardly the core of Wilder's work. As for the effect on Wilder's academic career and professional opportunities, every case that either party has cited in their briefing says the same thing: when one scholar presents another scholar's work in an academic setting, she deprives that other scholar of the ability to reap the goodwill of that very use of the work. Publication and presentation opportunities in the academic world are finite. Hoiland's gain is inevitably Wilder's loss.

Hoiland's last-gasp argument on ownership also does her no service. Wilder wrote the course materials and is therefore the putative author. If Hoiland wanted to argue the materials were created as a work for hire, she was obligated to say so at the outset of the case—and to bear the burden of proof in doing so. Binding authority from this Court underscores this rule. But Hoiland makes the same mistake that the court below did: she simply brushes aside that authority as if it never existed. She cannot write the rules of the road to her liking.

Finally, Hoiland's attorney fees argument fails resoundingly. The district court easily rejected Hoiland's demand for fees. Wilder's arguments below were objectively reasonable—indeed, they were correct—and she conducted nothing in this lawsuit in bad faith. Now Hoiland takes on the lower court's ruling under one of the most deferential standards of review known to this Court. But her submission is little more than a paste and copy of *her very brief below*. If anyone has acted unreasonably in this case, it is Hoiland.

4

## ARGUMENT

### I. NO REASONABLE JURY COULD FIND THAT HOILAND'S USE OF WILDER'S WORK WAS COVERED BY AN IMPLIED LICENSE.

#### A. Supplemental Statement of Facts Relating to the Issue of Implied License.

Wilder's opening motion contained a statement of facts that was tailored to the fair use argument. Now that Hoiland has asked this Court to affirm on the grounds of implied license, Wilder presents here a supplemental statement of facts that is tailored to the implied license argument.

1. In 2011, Wilder was awarded a National Science Foundation grant of $600,000 for a faculty development project known as "NICHE," an abbreviation for "Numeracy Infusion Course for Higher Education." JA-47; JA-222. Wilder wrote the NSF grant proposal and served as the program's sole director (or "Principal Investigator," in the project vernacular) throughout the life of the project. JA-47; JA-222. Wilder also developed and created most of the eight modules that comprised this faculty development program. JA-47-48. The apex of those course materials, which has frequently been referred to in this case as "Unit 7H," was the assessment module. JA-62-63; JA-48. That module, which

5

Wilder wrote, taught faculty participants in the program to assess their *own* QR teaching—what worked, what didn't work, and what could be improved in the future. JA-62-63.

Wilder was compensated for her role in NICHE. The program brought her a measure of professional recognition, publication opportunities, and goodwill. She did not receive this in exchange for the course materials alone. Her creation of the course materials, while significant, was just one of Wilder's many contributions to NICHE. Wilder served as the director of the program from 2011 through 2016. JA-47. In the course of those six years, Wilder worked relentlessly to carry out all of the objectives of her grant proposal, which were as follows:

> to provide instruction on best practices for teaching QR; to foster the development of instructional materials that make use of effective strategies for teaching QR; to infuse QR into a wide range of disciplines and CUNY colleges; to increase faculty interest and comfort in teaching QR; to strengthen the faculty's own QR skills, if necessary; and to establish a network of faculty who are committed to improving students' QR abilities.

JA-223.

2. Access to the NICHE course materials was carefully controlled during the life of the program. Wilder was committed, as noted, to disseminating course materials to other institutions. JA-223. But those

6

materials were not to be just distributed willy-nilly. Instead, Wilder made all final decisions on how the course materials would be distributed. The full-text course materials were posted in Blackboard, a content management program accessible only to the CUNY faculty that enrolled in NICHE, the administrators, and the external evaluators of the program. JA-49. Moreover, each of the NICHE instructional videos— in every unit of the course—included a statement that unauthorized use of the course materials was strictly prohibited and that any questions regarding the authorization of use of the NICHE materials should be directed to Wilder. JA-48. That statement is shown here:

© Copyright 2013. This presentation is owned by CUNY NICHE. Unauthorized use of any of the material in this presentation or any supplementary course material from NICHE is strictly prohibited. Please note that all sources referenced in this presentation are indicated on our NICHE web site (www.teachqr.org). Any questions regarding the authorization for use of materials from NICHE should be directed to Esther Isabelle Wilder (ewilder@gc.cuny.edu).

JA-233.

During the years that the NICHE program was active, neither Wilder nor anyone else distributed the full text of the course materials. Although Wilder attended conferences and gave several presentations about the project, she never shared the full text of any course materials from the project. JA-49. Wilder also published several papers that evaluated the effectiveness of the NICHE program but, again, did not

7

make public the full text of any of the underlying course materials. JA-49.

3. The NICHE program eventually evolved into the Numeracy Infusion for College Educators program, or NICE. JA-49-50. At Wilder's invitation, Hoiland served with Wilder as a director of this follow-on program. JA-50. NICE used the same eight integrated modules as NICHE, including essentially identical text in Unit 7H. JA-52. Moreover, NICE was even more limited in distribution than its predecessor: while NICHE was open to faculty throughout the CUNY system, NICE was available only to faculty and students at the three Bronx-based Hispanic-serving institutions within the CUNY system. JA-49-50.

As with NICHE, Wilder's contribution of materials to the NICE program was only a small part of her role in the project. In fact, it was even a smaller role than with NICHE because the NICHE instructional materials—including Unit 7H—were essentially incorporated wholesale into NICE unchanged. JA-52. The NICE grant was approved in 2016 and the project ran from 2017 through 2019. JA-52. As co-director of the NICE project, Wilder assumed responsibility for recruitment and admission into the NICE program and directed research activities based on the

8

quantitative assessment data gathered. JA-52. She also guided faculty participants through the program, and co-organized the "capstone" conference at the end of the program where faculty participants presented on their assessment results.

4. Access to the NICE materials, like the NICHE materials before it, was carefully controlled during the life of the program. Wilder, again, made all final decisions on how the materials would be distributed. The full-text course materials continued to be posted in Blackboard, the locked-down content management program accessible only to the CUNY faculty. JA-49, JA-112. As with NICHE, full course materials for NICE were prominently labeled with a warning against unauthorized distribution and were available only on the access-limited CUNY Blackboard system. JA-53. In fact, even Hoiland, a CUNY professor herself, could not access the materials until Wilder enrolled her as a faculty participant in the program. JA-52. (And once the program ended, she no longer had access to the materials. SA-19.) Moreover, as with NICHE, each of the NICE instructional videos included a statement that unauthorized use of the course materials was strictly prohibited and that

9

any questions regarding the authorization for use of the NICHE materials should be directed to Wilder. JA-53.

Hoiland was well aware of this express requirement. In 2017, Wilder and Hoiland co-presented (along with a third colleague, Frank Wang) at a meeting of the Mathematical Association of America on the topic "From NICHE to NICE: Training Faculty in Best Practices for Quantitative Reasoning Instruction." JA-295. The last page of their PowerPoint presentation contained another statement—identical to those on all of the instructional videos—that "questions regarding the authorization of the materials from NICHE/NICE should be directed to Esther Isabelle Wilder":

© Copyright 2016. This presentation is owned by CUNY NICHE and CUNY NICE. Unauthorized use of any of the material in this presentation or any supplementary course material from NICHE is strictly prohibited. Please note that all sources referenced in this presentation are indicated on our NICHE web site (www.teachqr.org). Any questions regarding the authorization for use of materials from NICHE/NICE should be directed to Esther Isabelle Wilder (ewilder@gc.cuny.edu).

JA-177.26.

For most of the NICE program, as with the NICHE program before it, neither Wilder nor anyone else distributed the full text of the course materials. Wilder and Hoiland presented at a number of conferences—sometimes together, sometimes separately—at which they described the program in broad terms and presented the assessment results. But at no

10

time did either Wilder or Hoiland ever publicly disclose the full text of Unit 7H or any of the other course materials. JA-54 (Wilder description of her presentations); SA-4-12, 14-17 (Hoiland description of her presentations).

5. It therefore did not strike Wilder as unusual when, in July 2018, Hoiland advised her that she was planning to present about NICE at a conference in Orlando entitled the Community College Conference on Learning Assessment, or CCCLA. JA-167. The conference would be a significant boon to Hoiland, who described the CCCLA as a "great conference" with a "semi-competitive proposal selection process." JA-408. (Indeed, Hoiland had been part of a team that tried and failed to present at the same conference several years earlier. JA-408.) Wilder assumed that Hoiland's presentation at that conference, like all of her presentations about NICE in the past, would consist of her own research and assessment data that she created in accordance with the NICE proposal and her prior presentations. JA-54; JA-229.

But Wilder could not have imagined what would happen next. In the summer of 2019—some half a year after the CCCLA conference—Hoiland disclosed to Wilder the text of her presentation. The text, as

11

nobody in this case has disputed, used substantial amounts of Wilder's
Unit 7H (without any written attribution) in five of its 19 textual slides.
*See* App. Br. 11-16. Wilder immediately wrote back to say she was
"shocked" by the amount of copying. JA-389. She also said she "felt bad
that you had not even acknowledged me" in the written document. JA-
389. And she made clear that while she was hurt at not getting
authorship credit, her frustration at Hoiland went much further than
that:

> I was frustrated and hurt because you had included so many
> of my slides without providing any authorship credit. I am not
> just concerned about getting credit for my role in the project,
> although that is important. My main concern is more specific:
> approximately half the text slides that you presented were my
> work. How would you feel if you encountered a
> presentation/paper that included such a large proportion of
> your work, taken nearly verbatim, without attribution or
> permission?

JA-443.

6. Wilder took her concerns of plagiarism to officials at Hostos. The
Research Integrity Officer there, Dr. Yoel Rodriguez, concluded that
while it was "not an easy decision," there was not sufficient evidence to
support further investigation. SA-25. Central to his determination was
his conclusion that "*there was no previous agreement* on what to

12

disseminate/publish as a result of the NSF grant." *Id.* Thus, he concluded, the dispute was "due to miscommunication and naiveté" by Hoiland. SA-54. He recommended that Hoiland sign a "Letter of Understanding" about, among other things, "being aware of not using Dr. Wilder intellectual property ... nor the work of the NICE program participants without their proper authorization." *Id.*

> **B.    In Order for a License to Be Implied, There Must Be a "Meeting of the Minds" Over the Existence and Scope of Such a License.**

1. A defendant who seeks to take advantage of the implied license defense faces an uphill burden. That is because "[c]ourts have found implied licenses only in narrow circumstances." *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000) (cleaned up). For one thing, "[t]o raise a triable issue, [Hoiland] must proffer evidence supportive of an implied license." *Goodman v. Universal Beauty Products Inc.*, 17-CV-1716 (KBF), 2018 WL 1274855, at *5 (S.D.N.Y. Mar. 9, 2018); *See also Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995) (defendant has "the burden of coming forward with evidence of a license"). Moreover, an implied license "cannot arise out of the unilateral expectations of one party." *Design Options, Inc. v.*

13

*BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996). Rather, there must be objective conduct that would permit a reasonable person to conclude that "an agreement ha[s] been reached." *Id.* To put it another way, the objective facts must show a "meeting of the minds between the parties to permit the particular usage at issue." *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022).

2. While the analysis of an implied license defense is extremely fact-dependent, the courts in this Circuit and others have established a widely-followed set of factors to consider. Those non-exclusive factors include the following:

**Whether the creator manifested an objective intent to retain control of the work at issue.** Where a creator has openly stated (or otherwise manifested) that she will permit the use at issue, courts will often find an implied license. On the other hand, where a creator has manifested an intent *not* to allow the issue, an implied license will rarely be found. *See, e.g., Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1238 (11th Cir. 2010) (fact that photographer "marked the photographs with metadata containing his contact information and 'all rights reserved'" weighed against implied license); *Photographic Illustrators Corp. v.*

14

*Orgill, Inc.*, 953 F.3d 56, 66–67 (1st Cir. 2020) (fact that creator's public website stated that "[t]his site or any portion of this site may not be reproduced, duplicated, copied, sold, resold, visited, or otherwise exploited" weighed against implied license); *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 143 (S.D.N.Y. 2019) (written agreements, even if covering a different use, provide "compelling evidence of the parties' expectations" regarding whether a license . . . [has] been granted); *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998) (proposed written agreements, even if never executed, "speak to . . . intent").

By the same token, it also matters what the *recipient* of the materials understood about the creator's intent. Evidence of the creator's manifest intention to control the materials is all but fatal to an implied license argument. The fact that the recipient *understood* that manifest intention buries the hatchet even deeper. *See, e.g., MacLean Associates, Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 779 (3d Cir. 1991) ("Both [the creator] and [the recipient] knew that [the creator] was developing [the work] solely for [his own] account. Never did [the creator] give [the recipient] any indication that [the recipient] could exploit [the

15

work] to the extent that it allegedly did by copying parts of it wholesale into computer programs it would later market generally as a business consultant in competition with [the recipient's] own consulting firm").

**Whether the creator's contribution to the overall project would be of "minimal value" without a license.** *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 559 (9th Cir. 1990); *id.* (To hold that special-effects creator did not convey license to use footage in film "would mean that [its] contribution to the film was of minimal value, a conclusion that can't be squared with the fact that [filmmaker] paid [special effects company] almost $56,000 for this footage"); *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir.1984) (writer implicitly granted publisher the right to publish his earlier works to the extent they had been incorporated into his submission to the publisher because otherwise "writer's contribution to the [publication] would have been of minimal value"); *Garcia v. Google, Inc.*, 766 F.3d 929, 937 (9th Cir. 2014), *rev'd on other grounds*, 786 F.3d 733 (9th Cir. 2015) (film actor implicitly gave license to producer to use her performance because "[w]ithout an implied license, the performance for which she was paid would be unusable"); *Photographic Illustrators*,

16

953 F.3d at 65 (implied license found where recipient "paid a substantial sum" for the work).

By contrast, no license is implied where one is not "necessary to effectuate the purpose" of the broader transaction. *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996). *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301 (S.D.N.Y. 2000) is particularly instructive. There, the manufacturer of picture frames hired a photographer to take pictures of its product in return for payment of $3,700. The parties then disputed whether the photographs were limited to use by the manufacturer's salespeople (as the photographer contended) or whether they could be used for customer advertising (as the manufacturer contended). The court found that there was no implied license for the latter use. Critically, the court noted, the manufacturer received useful value from its investment even without the proposed license. *Id*. at 317 ("The absence of an implied license to reproduce the photographs for catalogues and computer generated images does not render the . . . prints useless; they are useful as sales tools without implying a license."); *see also Design Options,* 940 F. Supp. at 92 ("Accordingly, an implied license is in no way necessary to effectuate the

17

purpose for which [the alleged infringer] purchased the goods, i.e., the resale of those goods. [The alleged infringer] received the benefit of the bargain it made with [the creator] when it resold the sweaters to its own customers, presumably at a profit").

**Whether the copyright owner received substantial compensation for creation or delivery of the work.** This factor looks at the value of the putative license to the *creator* (as opposed to the recipient). Where a creator is substantially compensated for the initial delivery of the work, courts will be more likely to find an implied license. *See, e.g., Effects Associates, Inc.*, 908 F.2d at 558 (copyright owner's argument "can't be squared with the fact that [studio] paid [it] almost $56,000 for this footage"). But courts will generally not find an implied license where the copyright owner's compensation for the work is minimal. *Atkins v. Fischer*, 331 F.3d 988 (D.C. Cir. 2003), is particularly instructive. In that case, a nascent beer brewery asked a graphic designer to create a label for its new brand. They orally agreed that the designer will do a rough sketch for $2,000 and a final draft for $4,000. After the artist delivered the initial sketch, however, the brewery gave the work to another artist to complete. The court found that there was no implied

18

license in that case. "This [was] especially so," the court emphasized, "considering the relatively small price [the brewery] paid for completion of the first stage of the agreement." *Id.* at 992; *see also id.* at 992-93 ("Arguably, [the artist's] acceptance of the relatively small payment of $2000 for the use of her copyright designs supports a finding that the intent of the parties was that only a limited license be conveyed. This factor distinguishes the present case from *Effects*."); *see also Tsai v. Westcoast Prof'l Group, LLC*, CV 04-9754GHKAJWX, 2005 WL 5714357, at *4 (C.D. Cal. Jan. 25, 2005) (noting "the relatively small amount of remuneration, suggesting only a limited license").

**Whether the parties anticipated "a short-term discrete transaction as opposed to an ongoing relationship."** *Nelson-Salabes, Inc. v. Morningside Dev.*, LLC, 284 F.3d 505, 516 (4th Cir. 2002); *see also Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008) (same). Cases finding implied consent often rest on the fact that the relation between the parties was intended to be a discrete one. *See, e.g., Effects*, 908 F.2d 558 (copyright owner created a work and simply "handed it over"). But courts will generally not find an implied license where the parties anticipate a long-term relationship. *E.g., John G.*

19

*Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 41 (1st Cir. 2003) (no implied license where architect "was in a long-term relationship with [property owner] working on development of the site, not a one-time arrangement"); *Nelson-Salabes*, 284 F.3d at 516 (no implied license where a developer and an architect "were engaged in an ongoing relationship that contemplated [the architect's] future involvement" in the development).

**Whether the work was delivered directly to the alleged infringer or whether she obtained it through an intermediary.** *Effects*, 908 F.2d at 558; *id.* ("Effects created a work ... and handed it over, intending that defendant copy and distribute it"). *Johnson v. Jones* is an instructive example. There, an architect delivered plans to a homebuilder. A different architect, at the homebuilder's request, obtained those plans from a city inspector. The fact that the new architect got the plans from an intermediary rather than the original architect himself, the court found, weighed heavily against an implied license. *Id.* at *12 ("Having acquired the drawings from other sources, [the new architect] cannot argue that his acquisition created an implied license. Indeed, the evidence demonstrates that [the original architect] was not

20

even aware that his plans were being used until January, 1994, when he stopped by the . . . house job site."); *see also Graham v. Prince*, 15-CV-10160 (SHS), 2023 WL 3383029, at *23 (S.D.N.Y. May 11, 2023). ("Here, Graham does not dispute that a license was granted to Facebook via the terms of service; rather, Graham contests that the terms of service extend the license to 'everyone else,' including Prince.").

**Whether the recipient uses the work in ways that are in competition with the creator.** An implied license is especially unlikely where the recipient uses the work in ways that are in competition with the creator. For example, in *MacLean Associates, Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769 (3d Cir. 1991), an employee developed software for his company. After he left his employment, the company used it to develop other programs that it marketed to clients. The court found that while the company had an implied license to keep using the software, that license did not go so far as to allow it to make derivatives of it and market it to others. *Id.* at 779 ("Never did Mr. MacLean give Mercer any indication that Mercer could exploit JEMSystem to the extent that it allegedly did by copying parts of it wholesale into computer programs it would later market generally as a

21

business consultant in competition with Mr. MacLean's own consulting firm."). *Johnson v. Jones* is also instructive. There, a homebuilder hired an architect to build her "dream house." The architect created and submitted initial plans while the parties negotiated over a contract for his services. Before a contract was signed, the homebuilder fired the architect and gave the plans to another architect to finish the work. The court easily found that there was no implied license. "It is one thing for an architect to allow the owner to hire someone else to build a house from the architect's plans. It is quite another for the architect to allow a competitor to come in and claim the architect's work as his own. Put simply, Johnson's drawings were used in a way he never intended-i.e., a rival architect claimed them as his own work and completed the Jones house without Johnson's involvement." *Id.* at 501.

**Whether there was a pattern of acquiescence on the part of the creator to the use of the work.** *See, e.g., Photographic Illustrators*, 953 F.3d at 66 (implied license found where creator knew that recipient was using his work but "never objected" to it).

### C. No Reasonable Jury Could Find That Hoiland Met Her Burden of Proving That There Was a "Meeting of the Minds" Over Hoiland's Right to Use Wilder's Material for Her Own Professional Benefit.

The objective facts in this case do not show a "meeting of the minds" over the existence of an implied license. In fact, *no reasonable jury* could find such a meeting of the minds. Even the ethics officer at Hostos—*who ruled against Wilder in every other way*—found that there was no meeting of the minds. *Supra* at 12 ("there was *no previous agreement* on what to disseminate/publish as a result of the NSF grant"). The ethics officer's conclusion is thoroughly supported by the caselaw and the evidence, as is shown below:

**Manifest intention: Wilder manifested an objective intent to retain control of the course materials.** Every objective indicia of Wilder's intent shows that she did not intend to grant Hoiland a license to use her work. Wilder kept the materials in a password-protected website and expressly made clear that her permission was required to use the materials. *Supra* at 9-10. Moreover, she never made public the full text of the course materials (and certainly never shared them at any academic conference). *Supra* at 10-11. That brings her squarely within the ambit of caselaw finding no implied license. *See, e.g., e.g., Latimer*,

23

601 F.3d at 1238 (fact that photographer "marked the photographs with metadata containing his contact information and 'all rights reserved'" weighed against implied license); *Photographic Illustrators*, 953 F.3d at 66–67 (1st Cir. 2020) (fact that creator's public website stated that "[t]his site or any portion of this site may not be reproduced, duplicated, copied, sold, resold, visited, or otherwise exploited for any commercial purpose without express written consent" weighed against implied license). And Hoiland was well aware of this limitation on the use of Wilder's materials. In fact, she and Wilder gave a joint presentation which had the exact same language on it. *Supra* at 10. What's more, the full course materials were stored were stored under password protection in the Blackboard system available only to CUNY participants in the program. Hoiland was well aware of that as well. *Cf. MacLean Associates*, 952 F.2d at 779 ("Both [the creator] and [the recipient] knew that [the creator] was developing [the work] solely for [his own] account").

In fact, one judge on this Court, when sitting on the Southern District, has found that this factor weighs against an implied license in a case that is eerily similar to this one. In *Pavlica v. Behr*, 397 F. Supp. 2d 519 (S.D.N.Y. 2005) (Chin, J.), a high school science teacher developed a

24

method to instruct students how to conduct scientific research "based on a Ph.D. model." *Id.* at 523. He then applied for and won, in collaboration with two other academics, a four-year grant from the National Science Foundation to fund workshops to train high-school teachers on his method.[1] He distributed copies of his training manual during the course of the program and also attached it to a successful renewal application to the NSF. Two years into the renewed NSF program, the science teacher insisted that his colleagues not distribute copies of his manual without his permission. After he was terminated from the program shortly thereafter, he brought suit against his now-former colleagues. The defendants moved for summary judgment on several issues, including implied consent.

The court, in an opinion by Judge Chin, found that the defendants were not entitled to summary judgment on the issue of implied consent. The court noted the science teacher's insistence that any use of the manual was tied to his continued employment under the NSF grant. But

---

[1] The grant in *Pavlica* was administered by the Research Foundation of the State University of New York. In this case, the grant at issue was administered by the Research Foundation of the City University of New York.

25

critical to the court's finding was that "the warning on the first page of the manual submitted with the grant application and distributed at workshops clearly stated that '[a]ny reproduction is prohibited unless permission is granted by the author.'" *Id.* at 526-27.[2]

The *Pavlica* case is striking authority for Wilder's position here. In fact, this factor alone should be enough to doom Hoiland's claim.

**Value of the contribution: The course materials were worth far more than "minimal value" to the NICE program without an implied license**. The implied license asserted by Hoiland was utterly unnecessary to the success of the NICE program. For the more than seven years before the CCCLA conference—from late 2011 to early 2019—the NICHE and follow-on NICE programs thrived. This is hardly a case where Wilder's contribution to the overall project would be of "minimal value" with a license. *Effects*, 908 F.2d at 559. Nor was a license

---

[2] The court also found that even if the science teacher implicitly granted a license to his work, he may well have revoked it by his demand that the work not be used without his consent. But the court noted that because the teacher may have received consideration in return for such a license, there were open questions about whether such a revocation would have been effective. Accordingly, the court's finding as to the effect of the written notice was an independent basis for denying summary judgment to the accused academics.

26

necessary to effectuate the purpose" of the NICE program. *Design Options*, 940 F. Supp. at 92. And it is not *remotely* a case—so often the fact setting where implied licenses are found—where Wilder could hold the entire program hostage due to her control of the course materials. *Cf. Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 828–29 (9th Cir. 2001) (If accepted, [the creator's] claim that although it was hired to create documents for the project, [the recipient] had no right to use the documents to build the project, would allow architectural or engineering firms to hold entire projects hostage, forcing the owner either to pay the firm off, continue to employ it, or forego the value of all work completed so far and start from scratch."). Wilder's ability to prevent Hoiland from publicizing the full text of her course materials at an academic conference left the NICE program free to thrive in every way.

**Compensation for the work: Wilder received compensation for her extensive involvement with the program, not merely for her delivery of the course materials**. Wilder's financial, reputational, and goodwill benefits did not just come from her authorship of the course materials. They came out of her decade of successful stewardship of the program, and her training of dozens of faculty enrollees who

27

subsequently improved the quantitative reasoning skills of thousands of CUNY students. If she had merely delivered the course materials and walked away from the program, she would have received none of those benefits. *Compare Effects*, 908 F.2d at 558 (copyright owner's argument "can't be squared with the fact that [studio] paid [it] almost $56,000 for this footage") *with Atkins*, 331 F.3d 988 (D.C. Cir. 2003) (no implied license found "considering the relatively small price ... paid for completion of the first stage of the agreement").

**Length of relationship: Wilder and Hoiland anticipated a lengthy collaboration with one another and with the NICE program**. Wilder and Hoiland both anticipated a long collaboration in the NICE program. *E.g., John G. Danielson*, 322 F.3d at 41 (no implied license where architect "was in a long-term relationship with [property owner] working on development of the site, not a one-time arrangement"); *Nelson-Salabes*, 284 F.3d at 516 (no implied license where a developer and an architect "were engaged in an ongoing relationship that contemplated [the architect's] future involvement" in the development).

28

**Direct or third party delivery: Wilder did not deliver the course materials to Hoiland.** Wilder created the course materials many years before NICE began. As a result, by the time Hoiland started working with Wilder, she gained physical access to the course materials only from the pre-existing Blackboard platform, not from Wilder herself. *Supra* at 9. *E.g., Johnson*, 149 F.3d 494 (6th Cir. 1998) "Having acquired the drawings from other sources, [the new architect] cannot argue that his acquisition created an implied license").

**Direct competition: Hoiland used the course materials in direct competition with Wilder**. Wilder did not attend the CCCLA conference and was not credited as a presenter or author until retroactively (and even then only in a limited sense, since the PowerPoint presentation bore only Hoiland's name and was not redistributed after Wilder's name was added). Hoiland thus helped herself to all of the professional recognition for the presentation. *E.g., Johnson*, 149 F.3d at 501 ("Put simply, Johnson's drawings were used in a way he never intended—i.e., a rival architect claimed them as his own work and completed the Jones house without Johnson's involvement.").

**Wilder never acquiesced to Hoiland's use of the course materials at a presentation**. The parties engaged in multiple presentations—some together, some separately—related to the NICE program. Not once (prior to the CCCLA conference) did Hoiland use the full text of the course materials in that conference—and far less did Wilder *acquiesce* in such use. *Supra* at 10-11.

### D.   Hoiland has no meaningful arguments against the law and objective facts above.

1. Hoiland has no meaningful response to the arguments above. Her opening brief makes the obligatory passing reference to the standard for an implied license. *See* Resp. Br. 50 (reciting basic "meeting of the minds" test), 51 (reciting caselaw standing for uncontroversial proposition that there is an implied license where a creator provides copyrighted material to another party for a "particular purpose," and the receiving party uses the material "consistent with that purpose"). But Hoiland makes no effort to analyze the various *factors* that go into the implied license analysis. She makes no analysis, for example, of whether Wilder and Hoiland anticipated a long-term or short-term relationship, the relative value of Wilder's Unit 7H to Hoiland in the absence of an implied license, the compensation earned by Wilder for her contribution of Unit 7H, whether

30

Unit 7H was delivered directly to Hoiland or to an intermediary, or any of the other factors that courts have traditionally used—over the development of nearly half a century of implied caselaw. Hoiland's argument fails for this reason alone.

2. Hoiland's implied license argument instead relies on a single document: the proposal that she and Wilder submitted to the National Science Foundation in support of the NICE grant. JA-305-379.[3] Hoiland's brief pulls language from three different sections of that proposal. The relevant language (presented in fuller context than shown in Hoiland's brief) is the following:

**"Broader Impacts" [JA-320]**

The NICE project will serve faculty at the 3 CUNY HSI colleges in the Bronx. Over the course of the project, faculty development awards will be provided to 20 faculty who will incorporate QR instruction into their courses. NICE will therefore impact the educational experiences of thousands of students each year. The Bronx is NYC's poorest borough, and its CUNY student population is overwhelmingly minority, female, and economically and academically disadvantaged.

NICE will also help faculty beyond CUNY. First, the project intervention and materials, including the NICE training program and the instructional materials that faculty develop, will be made readily available on the NICE project website.

---

[3] Another copy of the document is in the Joint Appendix at JA-89-163. Because Hoiland's brief cites to the latter, we do too.

31

Second, the research on the effectiveness of NICE, especially the analyses of different modes of delivery (online vs. in-person), will contribute to our understanding of best practices for faculty development. To ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, the results will be presented at conferences, published in journals and disseminated through other relevant outlets.

### "NICE at CUNY and Beyond" [JA-329]

We will also support QR instruction through the dissemination of our research results. With an increasing emphasis on QR and accreditors' strong focus on assessment, there is high demand for programs and resources that can be used to promote and assess students' QR skills. To ensure that our materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, we will present at conferences, publish in journals, and disseminate our results through other relevant outlets. The National Numeracy Network (NNN) has pledged a commitment to this project (see attached letter from Eric Gaze, President of NNN), and their 2017 annual meeting will serve as a major dissemination vehicle for NICE.

### Budget Justification [JA-438-439]

The budget includes $7,000 for PI Hoiland to attend conferences both for professional development, dissemination activities, and networking with faculty from similar institutions. This includes the following: 2018 American Sociological Association (August 11-14 in Philadelphia), 2017 Hispanic Education Technology Services (HETS) Conference (January, TBD), 2018 The Alliance of Hispanic Serving Institution Educators (AHSIE) Annual Conference (March, TBD), and the 2017 League for Innovation in Community Colleges STEMTech (November 2016 in Philadelphia) or Innovations Conference (March 2017, San Francisco).

3. But the document Hoiland cites cannot bear the weight that she puts on it. Begin with the reference to the materials being "readily available" on a website. The fact that material is readily available on a website does not mean that it is simply free for the taking, with no terms or conditions whatsoever.[4] The leading textbook on copyright, Nimmer on Copyright, is readily available on the website of LexisNexis. But it costs (a whopping) $13,357.00 to download.[5] In this case, the terms and conditions of access to Wilder's course materials were simple and clearly stated: "questions regarding the authorization for use of materials from NICHE/NICE should be directed to Esther Isabelle Wilder." *Supra* at 7.

Hoiland was well aware of this limitation on the use of Wilder's materials. In fact, she and Wilder gave a joint presentation that contained the exact same language. *Supra* at 10. What's more, the full course materials were stored under password protection in the Blackboard system available only to CUNY participants in the program. Hoiland was well aware of that as well. Indeed, she needed to be given

---

[4] The full text of the course materials was actually never available on the public-facing NICE website, as Hoiland well knew.

[5] https://store.lexisnexis.com/products/nimmer-on-copyright-skuusSku-10441. *Cf., also*, www.amazon.com.

access by Wilder to those materials in order to participate in the NSF project at all—as she well knew. *Supra* at 9. If there was ever a meeting of the minds over the materials on the Blackboard platform, it was plainly this: If Hoiland wanted "authorization for use" of those non-public materials, she had to ask.

4. The references to conference presentations are of even less help to Hoiland. The language states that "[t]o ensure that our materials and evaluation results are widely available ... to educators, policymakers, administrators, and researchers, we will present at conferences, publish in journals, and disseminate our results through other relevant outlets." *Supra* at 32. Even on its face, this does not bear the weight that Hoiland puts on it. For one thing, the reference to "our materials"—in a proposal for the NICE program—is a reference to materials created *over the course of that program*. The course materials at issue here were created many years before. Moreover, the language starts with a reference to certain "materials" (the term is undefined) being widely available. But only two lines later, the wording is clarified by the phrase "disseminate our *results*." It is the results of the program—data showing its effectiveness

34

under various conditions, for instance—and not Wilder's course materials themselves, that are to be presented at conferences.

But it is not necessary to rely on the wording of the proposal itself. The objective practice of the two PIs *demonstrates* this. Prior to the CCCLA conference, Hoiland and Wilder gave multiple presentations about the NICE program at conferences around the country. Not once did either of them display (much less distribute) the full text of any of Wilder's course materials. *Supra* at 10-11. That was true even for the National Numeracy Network, which pledged a commitment to the project and whose 2017 annual meeting, the proposal made clear, "will serve as a major dissemination vehicle for NICE." Hoiland presented at *that* conference too—precisely as anticipated in the proposal. But she did not present any of Wilder's course materials there either. SA-4-8 (Hoiland deposition).

5. Hoiland also takes grotesquely out of context a passage of an email that Wilder wrote to Hoiland after learning of the CCCLA presentation. In the passage Hoiland cites, Wilder writes: "I am fine with other people using the materials from the NICE/NICHE faculty development program – and indeed, I'm flattered when they do – because

35

faculty development has always been important to me and I want to disseminate the materials as widely as possible." Resp. Br. 12. But Hoiland omits what came before and after that passage. Wilder's email was a reply to an email from Hoiland referencing a future expansion project that would build on NICHE and NICE: "I emailed you about an expansion project after hearing John Tsapogas [a CUNY colleague], and you said you were too busy with the new project but that you would be pleased if I proposed something." JA-387. And right after saying that she wanted to disseminate the program materials as widely as possible, Wilder followed that up with the following: "However, this shift in focus *in your proposed 'expansion*,' coupled with your presentation at the community college, has left me feeling worried and distrustful." JA-386. In its proper context, what Wilder was saying is clear: She wanted to disseminate the program materials not in the present but in a *future* program—and in a manner in which *she* would have a say over the way the materials would be used. The passage only *underscores*, rather than detracts from, Wilder's express intention to retain control of the materials.

36

6. Finally, it is important to note one other element of Hoiland's implied license: it is *without any limiting principle*. Hoiland makes much of the fact that she used Wilder's materials in only a "small presentation during a breakout session" of a conference. But the implied license she tenders is not tied to audience size. Indeed, imagine the following scenario: Hoiland gives the same presentation not at a community college event, but in front of hundreds of people at the annual meeting of the American Sociological Association. And she makes available on a shared drive accessible to every one of those attendees the written form of the presentation that makes no mention of Wilder's name. If Hoiland has an implied license to make her community college presentation in the way she did, then she has the license to make it in front of an audience many times larger—and to make it available for downloading to thousands more. She cannot avoid liability because of the happenstance of the CCCLA conference size.

37

E. **Even If the Court Does Not Feel Wilder Is Entitled to Summary Judgment on the Implied License Affirmative Defense, It Should Remand to the District Court With a Ruling That Hoiland Is Also Not Entitled to Summary Judgment.**

The Court can—and should—grant summary judgment to Wilder on the implied license issue.[6] At a minimum, however, a reasonable jury could find in Wilder's favor. If the Court finds that Wilder is not entitled to summary judgment, it should find that Hoiland is not either,

II. **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR HOILAND ON HER AFFIRMATIVE DEFENSE OF FAIR USE.**

A. **Factor One, the Purpose and Character of Hoiland's Use, Weighs Against Fair Use Because Hoiland Did Not Transform Wilder's Work and Because Hoiland's Non-Profit Educational Purpose Does Not Outweigh the Lack of Transformative Use.**

1. **Hoiland's argument about implied license cannot do double duty here.**

With the implied license question out of the way, Hoiland's fair use argument crumbles as well. That is because implied license, as Hoiland

---

[6] *See, e.g., Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 52 (2d Cir. 2021) (granting summary judgment to *plaintiff* on defendant's request for affirmance on the alternative ground of substantial similarity—even though the court below had not reached the issue.)

now sees it, is *a central part* of her fair use defense. In fact, it is now the very *first* argument for fair use. But the argument fails in this section of Hoiland's brief for the same reason it failed in the previous section of Hoiland's brief: it is simply wrong. There was no "meeting of the minds" that Hoiland could use the work in the way that she did. The argument does not help her here.

Stripped of the implied license argument, what Hoiland *really* seems to be saying here is that she should get a thumb on the scale because she acted in good faith. Resp. Br. 31. But "[c]opyright is not a privilege reserved for the well-behaved." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 32 (2021) (quoting Pierre N. Leval, Toward a Fair Use Standard, 103 Harvard L. Rev. 1105, 1126 (1990) ("Leval")). Hoiland identifies no authority saying otherwise.

### 2. Hoiland did not make a transformative use of Wilder's work.

The rest of Hoiland's first factor argument is just as weak. In fact, it is hardly responsive at all. Wilder's argument began, as was only logical, with an extensive analysis of the Supreme Court's landmark decision in *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023). Hoiland ignores the case entirely. That starts a

39

pattern that is followed throughout her brief. Wilder's opening brief, in addition to *Warhol*, analyzed Hoiland's fair use defense in light of 20 other leading authorities (three from the Supreme Court, six from this Circuit, eight from other Circuits, two from the district level, and one— *Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841)—that is considered to have created the fair use doctrine in the first place). Hoiland acknowledges *none* of them.

As a result, Wilder is left having to reply to a "response" brief that, in almost every possible way, does not actually respond to her argument. The gist of Hoiland's transformative use argument, which mimics that of the district court, is that she took the discrete course assignment of Unit 7H and turned it into an overview of the entire NICE program. *See* Resp. Br. 33 (Hoiland transformed by teaching attendees *about* the NICE program) (emphasis in original); *id*. (slides containing Wilder's text were merely "fleeting visual aids" and "there was a much bigger story" Hoiland was telling); *id*. at 34 (Hoiland added materials such as a faculty participant showcase and abstracts for grants); *id*. at 35 ("Hoiland provided extensive commentary about aspects of NICE"). But this is just a rehash of the district court's opinion. It does not actually respond to

40

Wilder's argument—or to the foundational Supreme Court decision on which Wilder's argument was based.[7]

Recall what the Supreme Court said in Warhol. The Court noted that courts must steer away from "an overbroad concept of transformative use" that would embrace "any further purpose or any different character." 598 U.S. at 529. Thus, the Court emphasized, whether the use of a copyrighted work has a further purpose or different character "is a matter of degree." *Id*. Moreover, the Court found, the first factor asks "whether *and to what extent* the use at issue has a purpose or character different from the original." *Id*. (emphasis in original). Central to the transformative use analysis, the Court emphasized, is that the first factor "*relates to the justification for the use.*" *Id*. at 532 (emphasis added). In other words, the Court explained, a work might be considered transformative "because copying is reasonably necessary to achieve the user's new purpose." *Id*. By contrast, if the new work "can stand on its

---

[7] For the reasons articulated in Wilder's opening brief, a jury could also easily find that Hoiland's description of how she "fleetingly" showed Unit 7H was not credible. Resp. Br. 56-57; JA-266 (Hoiland: "I focused on a sub-section of Unit 7" in my presentation). At a minimum, it is a jury issue.

own two feet" without the copying, the Court reasoned, it is not transformative. *Id*.

Hoiland does not address any of these principles—an unmistakable sign that she falls afoul of them. She dutifully recites that her use was different (in her words, "plainly," "distinctly," and "entirely" different, see Resp. Br. 32-33) from Wilder's. But the facts of this case speak for themselves. As the opening brief explained, Wilder created a document entitled a "QR Assessment Plan/Instrument" in order to train college faculty members how to assess the effectiveness of their QR teaching. JA-62. Hoiland slapped that together with other materials into a PowerPoint she entitled "Assessing Numeracy in a Faculty Development Program," JA-65, brought it to a conference of community college faculty members, and used it to train those faculty members in "best practices in faculty development related to assessment." JA-405. Only under the most "overbroad concept of transformative use," *Warhol*, 598 U.S. at 529, could Hoiland's purpose be different from Wilder's.

Hoiland also makes no effort to articulate a *justification* for her use of the materials. She claims that she made a transformative use by "teaching attendees about this grant-funded faculty-development

program, and commenting on challenges, successes, logistics and results." Resp. Br. 33. But that gives away the game. She did not need to use the full text of Unit 7H to teach attendees about the program and comment on its challenges and successes. And as her brief implicitly acknowledges, she did not comment on *the actual text of Unit 7H at all*. "[W]hen commentary has no critical bearing on the substance or style of the original composition, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish)." *Warhol*, 598 U.S. at 530-31. Hoiland's presentation said nothing about the substance, style or any other characteristic of Wilder's work. Her argument vanishes as well.

Even where Hoiland squarely responds to the substance of Wilder's brief, her arguments fail. Take the argument that the district court should have examined separately the reproduction and distribution of the written PowerPoint. Hoiland claims that Wilder has waived the argument, but that is nonsense: Wilder squarely raised the argument in her motion for reconsideration, both parties briefed it extensively, and the trial court squarely addressed it. There is no waiver here. Nor can Hoiland's written reproduction and distribution be excused as merely

43

"facilitating or enabling" their use in the oral presentation. Resp. Br. 40. If that were the case, Hoiland would only have made *one* copy of Wilder's work. She did not need to distribute the work to conference organizers and attendees to achieve that end. And Hoiland cannot foist blame on the conference organizers for requiring her to distribute her PowerPoint in advance of her presentation. If a conference on American literature required a presenter to hand out copies of The Great Gatsby as the price for entry, would that distribution be excused? The question answers itself.[8]

Hoiland gets no further traction when it comes to the edits she made to the underlying Unit 7H. She claims that she deleted instructional material for course participants (deadlines and peer review instructions and the like) because they would be "irrelevant to the conference attendees." Resp. Br. 38. But "no plagiarist can excuse the

---

[8] Hoiland claims there is no "non-hearsay" evidence that the PowerPoint was distributed. Resp. Br. 19. But Hoiland specifically acknowledged that the slides would be posted on the conference website and the mobile app for conference participants to download. JA-165. The conference organizer also said just as much in an email, and she could be called at trial to testify to that. *See* Rule 56(c)(2) (objection at summary judgement stage is valid if material at issue "*cannot be presented* in a form that would be admissible") (emphasis added). No reasonable jury could find that they were not *actually* distributed.

wrong by showing how much of [her] work [she] did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936). And taking out these procedural instructions did not transform Unit 7H any more than taking out ECF filing instructions would transform an appellate practice manual. *See* App. Br. 49-50. As for the wording that Hoiland added to the bottom of several slides, these were not remotely "commentary" on the slides, as she asserts. Resp. Br. 38. They were compilations of words taken directly from the text itself—the quintessential "facile use of the scissors" that Justice Story found not to be fair use almost two centuries ago. *Folsom*, 9 F. Cas. at 345.

Hoiland's argument about deletions misses the point in another way. She is wrong to think that she cut out the "heart" of Unit 7H. The substantive instructions on how to do a QR assessment, not the procedural steps for submitting one, are the heart of that work. But she also misses the *significance* of this fact. As Wilder made clear in her opening brief, courts look at the "amount and substantiality" of borrowing in two different ways. Where the question is how much of the *original* work was borrowed, that analysis is carried out in factor three. But when the question is how much of the *accused* work is borrowed, that issue

45

plays into the factor one analysis of whether the use was transformative to begin with. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 611 (2d Cir. 2006). Hoiland not only purloined the heart of Wilder's work—she used the same material as the heart of *hers*. Under this Circuit's doctrine, that cuts strongly against fair use.

### 3. Hoiland's non-commercial educational purpose does not outweigh the non-transformative nature of her copying.

Hoiland also misses the point when she discusses her non-commercial educational purpose. She argues, following the lead of the court below, that her use of Unit 7H for an educational purpose "weighs in favor of fair use." Resp. Br. 41. But here there is no transformative use. So the question Hoiland must ask herself is: does a non-commercial educational purpose *outweigh* a lack of transformative use? The answer to *that* question is no—as recent binding caselaw of this Circuit now demonstrates.

*Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024), is the authority for the proposition. In *Hachette*, book publishers brought a copyright infringement suit against a nonprofit digital library, challenging the library's practice of scanning print copies

46

of publishers' books to create digital copies and then lending those digital copies to users of the library's website. This Court concluded that the library's use of the works was not a transformative use, but that it also was not a commercial use. *Id.* at 179-186. It then made clear that "the nonprofit character of [the library's] use is not conclusive, and *transformativeness remains the central focus of the first factor*." *Id.* at 186 (cleaned up; emphasis added). *See also Grant v. Trump*, 20-CV-7103 (JGK), 2024 WL 4179057, at *9 (S.D.N.Y. Sept. 13, 2024) ("the lack of a profit motive is insufficient to overcome the lack of a 'transformative use' for purposes of the first fair use factor"). Hoiland has no argument against—indeed, does not even *address*—these cases. Her educational purpose will not equate to fair use.[9]

---

[9] In light of this new binding authority, Hoiland's attempt to distinguish *Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989), is no longer relevant. Nor does it matter any longer just *how much* benefit Hoiland got out of the CCCLA conference. As *Hachette* made clear, *transformativeness* is the central focus of the first factor. 115 F.4th at 186. How much or how little Hoiland got out of the conference makes no difference. But even if it did, Hoiland's argument would still fail. Hoiland argues that she "derived no professional benefits from this fleeting use." Resp. Br. 43. That is hard to square with Hoiland's own assessment of the CCCLA as a "great conference" with a "semi-competitive proposal selection process." JA-408.

### B. Factor Three, the Amount and Substantiality of the Taking, Weighs Heavily Against Fair Use Because Hoiland Took the Heart of Wilder's Work.

As Wilder argued in her opening brief, the court below underestimated the weight of this factor. The court found, correctly, that this factor weighed in favor of Wilder because Hoiland borrowed a full two-thirds of Wilder's text. SPA-39. But the court gave that only "slight" weight because the portion that Hoiland left out—Wilder's *procedural* instructions for the preparation of assessments—somehow constituted the "heart" of Wilder's work. SPA-39-40. In so doing, the court made the same error that it made when evaluating transformative use. The substantive instructions on how to develop a QR assessment, not the procedural steps for submitting one, are the heart of that work.

Hoiland does nothing more in her brief than to restate the court's opinion below. She adds nothing in this section of her brief—nor in the transformative use section of the brief—that would support the court's errant finding that procedural steps were the heart of Unit 7H. The district court, like Hoiland, erred on this point. The third factor points strongly against fair use.

48

C. **Factor Four, The Effect on Wilder's Academic Career and Professional Opportunities, Weighs Against Fair Use Because Hoiland's Use of the Course Materials Undercut Wilder's Ability to Make the Same Use.**

With every factor up to now either neutral or weighing heavily against fair use, Hoiland's last hope is the effect on the market. But this factor will give her no comfort. "[I]f [a] taking is unjustified under the first factor, it should be considered an infringement, *regardless of the absence of market impairment.*" Leval at 1124 n.84 (1990). Every case cited by *either* party in this case bolsters Judge Leval's conclusion. In *Marcus v. Rowley*, 695 F.2d 1171 (9th Cir. 1983), one teacher sued another for purloining a booklet about cake decoration and using it in adult education classes. The use was nonprofit and there was no harm to the market, but there was no transformative use. In *Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989), a professor made 50 copies of an infringing article, distributed it to only nine people, and recalled it before it got into the hands of his intended audience of students. 868 F.2d at 1316 (50 copies); *Weissmann v. Freeman*, 684 F. Supp. 1248, 1250 (S.D.N.Y. 1988) (given to nine employees; all retrieved before use). But there was no transformative use, so it was not *fair* use. 868 F.2d at 1326.

49

Hoiland has no meaningful response to any of this. She ignores *Marcus v. Rowley* entirely (though that case was relied on by this Court in *Weissmann, see* 868 F.2d at 1323). As to *Weissmann*, she tries to turn it into something that it wasn't. The *Weissmann* Court did say that the defendant's use of the article undermined the plaintiff's "ability to enjoy the fruits of her labor" and created "a distinct disincentive for her to continue to research and publish in the field of nuclear medicine." 868 F.2d at 1326. But the Court did not purport to be making a factual *finding* with that statement (far less, as Hoiland suggests, a "holding"). The court was just making the common-sense statement that when one academic uses another academic's work for the same purpose for which it was created, some market harm may inevitably be assumed—even if the evidence is, for all practical terms, difficult or impossible to muster. Nothing is different here.[10]

---

[10] *See also Quinto v. Legal Times of Washington, Inc.*, 506 F. Supp. 554 (D.D.C. 1981) and *Aitken, Hazen, Hoffman, Miller, P. C. v. Empire Const. Co.*, 542 F. Supp. 252 (D. Neb. 1982), both cited in Wilder's opening brief. In neither case was there affirmative evidence of market harm, nor did there need to be. Harm was simply a logical assumption in light of the nature of the similar uses. That, too, is applicable here.

### III. THE DISTRICT COURT ERRED IN DENYING WILDER'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF OWNERSHIP.

Hoiland misses the boat even further when it comes to ownership. Under the Copyright Act, ownership of Unit 7H vests initially in the author—in this case, Wilder. 17 U.S.C. § 201(a). Hoiland claims Wilder created it as a work for hire. And she claims it was *Wilder's* duty to disprove that. But "the party relying on the work-for-hire exception *bears the burden of demonstrating that it applies*." *Horror Inc. v. Miller*, 15 F.4th 232, 242 (2d Cir. 2021). The law could not be more clear. Hoiland flatly ignores this binding Circuit authority—and every other case Wilder cited that stands for the same point. That makes her argument not only wrong, but frivolous.

Nor does Hoiland have any answer to the waiver issue. "Failure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984) (cleaned up). Hoiland did not even raise a work-for-hire defense at summary judgment, to say nothing of in her answer.

51

Here is another piece of binding Circuit authority that Hoiland ignores. The work-for-hire argument has been long waived.[11]

## IV.  THE DISTRICT COURT CORRECTLY EXERCISED ITS DISCRETION TO DENY ATTORNEY FEES.

The Court correctly exercised its discretion to deny Hoiland attorney fees in this case. The standard of review of an award of attorney's fees is highly deferential to the district court. *Alderman v. Pan Am World Airways,* 169 F.3d 99, 102 (2d Cir.1999) (internal quotation marks omitted). " "'Abuse of discretion' is one of the most deferential standards of review; it recognizes that the district court, which is intimately familiar with the nuances of the case, is in a far better position to make certain decisions than is an appellate court, which must work from a cold record." *In re Bolar Pharm. Co. Sec. Litig.,* 966 F.2d 731, 732

---

[11] Hoiland's reference to evidence in the record only underscores why this issue is waived. She notes that at one point while the project was underway, Wilder stated that the course materials were owned by the program itself and not by her. (Which of course means nothing: Wilder is not a copyright attorney.) If Hoiland had raised this issue as an affirmative defense, Wilder would have put into evidence the obvious response: CUNY's *own* intellectual property policy making clear that professors like Wilder own the work that they do in connection with NSF grants. (The policy is readily available on the internet.) But Hoiland's failure to plead work for hire—combined with the trial court's decision to raise it without warning—deprived Wilder of any chance to do that.

(2d Cir.1992) (per curiam). Under that highly deferential standard of review, Hoiland's appeal does not come close.[12]

## A.    Wilder's Claim Was Objectively Reasonable.

Wilder's claim was objectively reasonable. That is all but controlling here. As Hoiland rightly acknowledges, courts are instructed to give "substantial weight" to the objective reasonableness of a losing party's position when deciding attorney fee petitions. Resp. Br. 61 (citing *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197 (2016)).[13] That rule is enforced with particular vigor in this Circuit. *See, e.g., Lava Records, LLC v. Amurao*, 354 Fed. Appx. 461, 463 (2d Cir. 2009) (rejecting "case law from other circuits" that presumptively awards fees to prevailing

---

[12] Hoiland's argument for remand on ground the court "did not adequately explain his reasoning" is completely off base. The court extensively set out the law and also set out the facts (in an extensive and detailed opinion on fair use). Nothing more was required. The two cases Hoiland cites do not help her either. In *Int'l Broth. of Teamsters, Joint Council 18 v. New York State Teamsters Council Health & Hosp. Fund*, 903 F.2d 919, 293-24 (2d Cir. 1990), the court did not even make conclusions of law . In *Bolar Pharm.*, 966 F.2d at 732, the court departed from a lodestar figure that was "strongly presumed to be reasonable." This case is not remotely similar.

[13] *See also BMS Entm't/Heat Music LLC v. Bridges*, 04 CIV 2584 (PKC), 2007 WL 1989292, at *3 (S.D.N.Y. July 6, 2007) (same); *TRF Music Inc. v. Alan Ett Music Group, LLC*, 06 CIV 0349 (PKC), 2006 WL 1376931, at *3 (S.D.N.Y. May 18, 2006) (same).

parties); *Otto v. Hearst Communications, Inc.*, 17 CV 4712 (GHW), 2020 WL 377479, at *3 (S.D.N.Y. Jan. 23, 2020) (rejecting presumptive entitlement rule and declining to award fees against a party that took an objectively reasonable position); *Jovani Fashion, Ltd. v. Cinderella Divine, Inc.*, 820 F. Supp. 2d 569, 575 (S.D.N.Y. 2011) (same).

And it is no small matter to find a claim objectively unreasonable. The standard is not frivolousness, but it is not far off. "Not all unsuccessful litigated claims are objectively unreasonable. The infirmity of the claim, while falling short of branding it as frivolous or harassing, *must nonetheless be pronounced.*" *CK Co. v. Burger King Corp.*, 92 CIV 1488 (CSH), 1995 WL 29488, at *1 (S.D.N.Y. Jan. 26, 1995) (emphasis added). Judge Sotomayor, when on the Manhattan district court bench, found that objective unreasonableness applied where the losing "claim … was, at best, speculative and remote." *Screenlife Establishment v. Tower Video*, Inc., 868 F. Supp. 47 (S.D.N.Y. 1994). That wording has oft been repeated since.[14] Even a resounding win on the merits does not

---

[14] *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 96 CIV 4126 (RWS), 2004 WL 728878, at *3 (S.D.N.Y. Apr. 6, 2004) ("speculative and remote"); *Psihoyos*, 2013 WL 1285153, at *3 (infirmity of the claim must be "pronounced").

necessarily translate into fees. *See Barcroft Media, Ltd. v. Coed Media Group, LLC*, 16 CIV 7634 (JMF), 2018 WL 357298, at *2 (S.D.N.Y. Jan. 10, 2018) ("although this case was not ultimately a close one, CMG's defenses were not so frivolous or objectively unreasonable that no party could see an opening ... through which the argument[s] could be squeezed").

Nor does it matter that the court below awarded summary judgment to Hoiland. "The conclusion that no reasonable jury could find copyright infringement on the part of [the prevailing party] is not tantamount to a finding that the positions asserted by [the losing party] were objectively unreasonable." *Inst. for the Dev. of Earth Awareness v. People for the Ethical Treatment of Animals*, 08 CIV 6195 (PKC), 2011 WL 2565373, at *1 (S.D.N.Y. June 14, 2011). *See also CK Company*, 1995 WL 29488, at *1 (same). Even a loss on a motion to dismiss does not equate to an objectively unreasonable case. *See Guity v. Santos*, 18 CIV 10387 (PKC), 2020 WL 4340417, at *1 (S.D.N.Y. July 28, 2020) (though claim of copyright infringement could be resolved merely by a facial review of the two works and without any need for discovery, "[t]he Court

cannot say that the plaintiff's claims are objectively unreasonable or frivolous").

The tendency against fees is especially applicable where summary judgment arises out of the "complex, fact-driven inquiry" of the fair use defense. *Otto v. Hearst Communications, Inc.*, 17 CIV 4712 (GHW), 2020 WL 377479, at *3 (S.D.N.Y. Jan. 23, 2020). Courts in this Circuit routinely deny attorney fees to the prevailing party in such cases. *See id.* (refusing fees to party who prevailed on summary judgment over fair use); *Barcroft Media*, 2018 WL 357298, at *2 (the losing party at summary judgment relied on "the defense of fair use, which turns on a fact-intensive, multifactor inquiry … that may well have made it difficult for [it] to assess over the course of the litigation its likelihood of success on the merits"); *Blanch v. Koons*, 485 F. Supp. 2d 516, 518 (S.D.N.Y. 2007) (rejecting fees even where prevailing party won on all four fair use factors at summary judgment).

In light of these considerations, Wilder's claim was eminently reasonable. One of the four factors, that of the amount and proportionality of the taking, came out in Wilder's favor. That strongly weighs in favor of overall reasonableness. *See Louis Vuitton Malletier,*

*S.A. v. My Other Bag, Inc.*, 14 CIV 3419 (JMF), 2018 WL 317850, at *4 (S.D.N.Y. Jan. 8, 2018), *aff'd*, 764 Fed. Appx. 39 (2d Cir. 2019) (summary judgment against handbag maker on fair use did not amount to objective unreasonableness where "one prong of the inquiry, commerciality, favored Louis Vuitton").

Two of the other factors required extensive analysis before tilting in Hoiland's favor—another reason why Wilder's argument was reasonable, even if not successful. The court below required eight pages of analysis to conclude that the purpose and character of Hoiland's use was different from that of Wilder's—and only reached that conclusion after a lengthy examination of the two works on their face, the extent and nature of revisions made by Hoiland, and extensive and heavily disputed record evidence about the context of Hoiland's presentation and her state of mind when giving it. That analysis could have easily gone either way. As for the fourth prong, effect upon the market, the court's five-page analysis relied heavily on the record as developed in discovery as well as its earlier analysis on transformative use. This factor, too, could reasonably have been decided for Wilder.

The broader context of this case also weighs against fees. The case arose in the academic setting—an area that doesn't make a lot of copyright law. (Most copyright cases involve the commercialized entertainment industries, for obvious reasons.) That is why the court below acknowledged that an "additional layer" of analysis was required. Op. at 41. Indeed, of the nineteen cases that the court cited in its fair use opinion, *only one* arose in a purely academic context. And that one, *Weissmann v. Freeman*, would have strongly favored Wilder if not for the (errant) transformative use finding. "[I]n order to support the further development of useful copyright jurisprudence, and thus further the purposes of the Copyright Act, district courts are disinclined to award fees in cases that are close calls or which present novel legal issues or theories." *Agence France Presse v. Morel*, 10 CIV 2730 (AJN), 2015 WL 13021413, at *2 (S.D.N.Y. Mar. 23, 2015), *aff'd sub nom. Presse v. Morel*, 645 Fed. Appx. 86 (2d Cir. 2016). The novelty of this case weighed heavily against the petition.

### B. Wilder's Lawsuit Was Not Motivated by Bad Faith.

With the lawsuit objectively reasonable, the other factors easily fall in line. Begin with bad faith. In every case Hoiland cites, the losing

58

party's claim was found to be objectively unreasonable. *Leary v. Manstan*, 13 CIV 639 (JAM), 2018 WL 1505571, *2 (D. Conn. Mar. 27, 2018) ("Plaintiff's claim was almost self-evidently doomed from the start"); *Hughes v. Benjamin*, 17-CV-6493 (RJS), 2020 WL 4500181, at *3 (S.D.N.Y. Aug. 5, 2020) ("Hughes's claims were objectively unreasonable—a fact that was clear from the face of the complaint and the videos at the heart of the dispute"). But Wilder's claim was objectively *reasonable*. So these cases do nothing to help Hoiland. They point *against* fees, not for them.[15]

Hoiland's bad faith claim should die on the vine right there. But her filings undermine the claim even further. Hoiland submitted correspondence between the parties prior to the litigation. JA-659-666.

---

[15] It is extremely rare for bad faith motivation or litigation misconduct alone to lead to attorney fees. An archetypal case is copyright trolling. *See Kirtsaeng*, 579 U.S. at 209 (singling out *Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588 (6th Cir. 2008)). There, the owner of a three-note chord from a George Clinton song sued *800* defendants for unlicensed sampling. The claims were not objectively unreasonable, but the plaintiff drew out the litigation needlessly in his losing effort. So "[w]hen viewed as part of the larger landscape of Bridgeport's litigation strategy, an award was justified." 520 F.3d at 594-95. The other example cited by the Court, *Viva Video, Inc. v. Cabrera*, 9 Fed. Appx. 77 (2d Cir. 2001), involved a forged affidavit. None of these cases resemble this one in the slightest.

59

But the correspondence proves Wilder's *good faith*. In June 2021, Wilder's then-counsel wrote to Hoiland's counsel with a series of requests. One was that she "cease all further use" of Wilder's work. JA-661. Hoiland's response merits quotation in full:

> "Dr. Hoiland will *not* acknowledge using Dr. Wilder's work without permission – she had permission. Dr. Hoiland will *not* advise Valencia College that the Intellectual Property License was inaccurate – it was entirely accurate. Dr. Hoiland will *not* cease all use of the NICE Course Materials; Dr. Wilder does *not* have the right to terminate the implied license as applicable to the NICE project."[16]

JA-661. (The italics are in the original.)

With this kind of response from Hoiland, what else could Wilder do? Wilder genuinely believed—and her belief was reasonable—that Hoiland was misappropriating her intellectual property. But Hoiland was now making it clear that she would *continue to do so*. And Hoiland could not have stated this more bluntly. She claimed she had permission to use Wilder's work. She refused to admit any wrongdoing in using Wilder's

---

[16] Hoiland's letter made clear that when she was referring to "NICE" materials, she was including the specific work—Unit 7H—that later became the centerpiece of Wilder's lawsuit. Her letter specifically stated: "Accordingly, and because copyright ownership vests in the author, we have reason to doubt that Dr. Wilder actually owns a copyright in the portion of the NICE Course Materials at issue ('Module 7')." JA-661. at 2.

60

work. She refused to stop using Wilder's work. She refused to compensate Wilder for her misappropriation. And to add insult to injury, she even claimed it to be "unclear" that the work was "actually drafted by Dr. Wilder." *Id.* at 3. Those are the very stuff of copyright lawsuits everywhere. A better reason to come to court could not be imagined.

Wilder brought this lawsuit not only to protect her copyright, but also to deter others in Hoiland's shoes from doing the same. She had every right to do so. Considerations of "compensation and deterrence" are at the heart of the Copyright Act. *Kirtsaeng*, 579 U.S. at 197. As such, "[a] desire to punish an alleged infringer by bringing a good-faith infringement action is a reasonable basis for bringing an infringement action." *Leary*, 2018 WL 1505571, at *3. *Blanch v. Koons* well illustrates the point. There, as noted above, the court found that an artist engaged in fair use when he used aspects of a photograph for a work of pop art. But the court refused to award attorney fees to the artist. *Blanch v. Koons*, 485 F. Supp. 2d at 518. In so doing, the court went out of its way to say that even though the photographer's motivation was "less to recoup a monetary loss than to punish an artist who seemed to have embarked on a series of appropriations of others' work without credit or payment,"

61

that motivation was still "reasonable." *Id*. at 518. Deterring the misconduct of infringers is a perfectly legitimate reason to bring a lawsuit.

Hoiland tries her best to come up with bad faith motivations—but they are either speculative, irrelevant, or distortions of the record.

*Argument*: Wilder had an "irrational fear" that her junior colleague was "trying to take over" the NICHE program. Resp. Br. 63 (citing opinion below at SPA 9-14). The citation to the district court's opinion makes it seem like *the court* found Wilder's fears to be irrational. But the court made no such finding—nor would the evidence support it. Wilder wrote an email to Hoiland right after she learned that Hoiland had used her work without her permission. SPA 9-10. Of course Wilder was worried about what Hoiland was planning to do next. Anyone in her shoes would feel the same.

*Argument*: Wilder filed a plagiarism complaint with CUNY "and hurried to do so because she *specifically* wanted to stop Dr. Hoiland's promotion in its tracks." Resp. Br. 64 (citing opinion below at SPA 15-16) (italics in original). The citation to the opinion makes it seem like the court made *this finding* as well. But the court made no finding about

62

Wilder's motives. All the court did was recite the facts: Wilder made a plagiarism complaint against Hoiland, and she wanted Hoiland to face consequences for the plagiarism. She had every right to do that.

*Argument*: Hoiland assured her she would receive credit and apologized for not using her name on the slides (and tried to get her credit retroactively) but "that wasn't enough" for Wilder. Resp. Br. 64. Actually, in the months before this litigation started, Hoiland's lawyer was backtracking on the apology (Hoiland "did not owe" one to Wilder, her lawyer claimed) and was accusing Wilder of bad faith. JA 663, 664. But even if we ignore her lawyer's intemperate letter, the result is the same. Imagine a photographer allowing a musician to use his work on the condition that he get proper attribution. If the musician didn't live up to those terms, his use would be infringing at the moment it happened— and would surely bring on a lawsuit. *E.g.*, *Crowley v. Jones*, 608 F. Supp. 3d 78, 88 (S.D.N.Y. 2022). It wouldn't be "enough" that the musician scrambled to give credit after the fact.

*Argument*: Hoiland commenced this litigation "fewer than three months after it was announced that Dr. Hoiland (through the Research Foundation of the City University of New York) had received a $2.3

million grant." Resp. at 64. Hoiland implies (but does not come out and say) that Wilder knew of the grant and filed the lawsuit as a response. In fact, Wilder did not learn of the grant until well after this lawsuit began. Declaration of Esther Wilder, March 14, 2022, pp. 1-2 (ECF 99 at 1-2].

*Argument*: Wilder refused to settle without admission of wrongdoing. Resp. at 64-65. Why should that matter? Wilder had every right to ask that wrongdoing be acknowledged. If she took the case to trial and prevailed, she would get exactly that. It was not bad faith to insist on it as part of a deal.

### C. Issuing an Award to Dr. Hoiland Will Not Serve the Goals of Compensation and Deterrence.

Hoiland's argument on compensation and deterrence is nothing more than a rehash of its bad faith argument—and it is just as meritless. Her cases recite the unsurprising principle that attorney fees are appropriate to deter frivolous and bad faith claims. *Mahan v. Roc Nation, LLC*, 634 Fed. Appx. 329, 331 (2d Cir. 2016) (claim was "frivolous"); *Walsh v. Townsquare Media, Inc.*, 565 F. Supp. 3d 400, *2 (S.D.N.Y. 2021) (claim was "not a close call"); *Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006), *aff'd*, 249 Fed. Appx. 845 (2d Cir. 2007) (contentions were "either frivolous or objectively unreasonable"). But

Wilder's claim was objectively reasonable. These cases weaken, rather than strengthen, Hoiland's petition.

Hoiland also misses the mark by claiming that her counsel's pro bono work strengthens her fee case. The nature of the pro bono representation does not, as Hoiland correctly states, undermine her claim for fees. But it does not *favor* it either. Hoiland cites no case standing for this unusual proposition. *Cf. Blum v. Stenson*, 465 U.S. 886, 894 (1984) (in civil rights context, "Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization.").

Nor does Hoiland's (admirable) dedication to teaching and improving the lives and social mobility of community-college students— or the fact that she is a single mother living in New York City on a professor's salary, for that matter—tilt the scales. Wilder and her husband also teach at CUNY, dedicate their careers to improving the lives of low-income students, and raise children. Declaration of Esther Wilder, March 14, 2022, p. 1 (ECF 99 at 1). And Wilder also does not have "a GoFundMe campaign [or] a rich uncle" backing her claim. *Hughes*, 2020 WL 4500181, at *4. She has exhausted her savings and has even

had to dip into her retirement account to fund this litigation. Wilder Decl. ¶ 1. Neither party gets a leg up on the petition because of their financial circumstances.

## CONCLUSION

The Court should reverse the grant of summary judgment to Hoiland on her affirmative defense of fair use, reverse the denial of summary judgment to Wilder on Hoiland's affirmative defense of fair use, reverse the denial of summary judgment to Wilder on her claim of ownership, affirm the denial of Hoiland's petition for attorney fees, and remand with instructions to enter summary judgment in favor of Wilder on Hoiland's defense of implied license.

/s/ *Matthew Hersh*
Matthew Hersh
MESTAZ LAW
5090 N. 40th Street
Suite 200
Phoenix, AZ 85018
Telephone: (602) 806-2068

*Counsel for Appellant-Cross-Appellee*
*Esther Wilder*

Dated: December 19, 2024

66

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation.

1. This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4) because this brief contains 13901 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a plain, roman-style typeface using 14-point Century Schoolbook.

/s/ *Matthew Hersh*
Counsel for Appellant-Cross-Appellee
Esther Wilder

## CERTIFICATE OF SERVICE

I, Matthew Hersh, hereby certify that on December 19, 2024, I filed the foregoing Brief of Appellant Esther Wilder, through this Court's CM/ECF system, that counsel for all parties are registered CM/ECF users, and that service of all parties will be accomplished through the CM/ECF system.

/s/ *Matthew Hersh*
*Counsel for Appellant-Cross-Appellee*
*Esther Wilder*

68